**In re BLUEWATER NETWORK and Ocean Advocates, Petitioners.**

No. 99–1502.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 16, 2000.

Decided Dec. 22, 2000.

Howard M. Crystal argued the cause for petitioners. With him on the briefs was Eric R. Glitzenstein.

Eileen T. McDonough, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief was Lois J. Schiffer, Assistant Attorney General.

Before: EDWARDS, Chief Judge, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

On March 24, 1989, the *Exxon Valdez* supertanker struck Bligh Reef in Prince William Sound, dumping nearly eleven million gallons of oil into Alaska's once-pristine coastal ecosystem. Congress responded with the Oil Pollution Act of 1990 ("OPA" or "Act"), Pub.L. No. 101–380, 104 Stat. 484 (1990). The Act not only broadened federal liability for oil spills, it also established substantive tanker design and evaluation requirements to prevent such spills from occurring in the first place. The Oil Pollution Act of 1990 is now more than ten-years old, but the Coast Guard, the enforcing agency, still has failed to promulgate regulations required by the Act. Citing the agency's failures on this score, petitioners Bluewater Network and Ocean Advocates now seek a writ of mandamus to compel the Coast Guard to finally make good on Congress' commitments.

One of the contested statutory provisions—§ 4110—requires the Coast Guard, by August 18, 1991, to promulgate regulations establishing minimum compliance standards and use requirements for tank level and pressure monitoring ("TLPM") devices. No such regulations currently exist. Furthermore, the Coast Guard admits that it will not undertake any rulemaking in the future, citing a temporary 1997 rulemaking that expired in 1999. The Coast Guard's earlier temporary compliance standards are of no moment. Petitioners' claim here, with which we agree, is that the agency's failure to pursue rulemaking once the temporary regulations expired was a blatant violation of the statute. The Coast Guard never stated in its 1997 regulation that, after sunset, it would simply abandon standard-setting altogether. Indeed, this does not even appear to be a viable option under the statute. Moreover,

the Coast Guard has never even attempted to promulgate equipment use requirements. It cannot now point to an admittedly incomplete, and now-expired, rule to avoid a congressional mandate to establish *some sort* of regulations.

The second contested provision—§ 4116(c)—requires the Coast Guard, by February 18, 1991, to initiate issuance of regulations to define waters, including Prince William Sound and two other named areas, over which single-hulled tankers must be escorted by at least two towing vessels. Citing an earlier rulemaking in which it promulgated regulations concerning the three *named* areas, the Coast Guard asserts that petitioners should have brought their mandamus claims regarding regulation of "other waters" in a petition for review of the earlier rulemaking. However, as with § 4110, petitioners are not challenging the earlier rulemaking; and the Coast Guard gave interested parties no reason to believe that the earlier regulations covering § 4116(c) would be the final word on the matter. Nonetheless, we do agree with the Coast Guard that § 4116(c) does not create a sufficiently clear duty regarding "other waters" to merit mandamus relief. In particular, it is not at all obvious whether § 4116(c) actually forces the Coast Guard itself to come up with the names of, and instigate rulemaking regarding, possible "other waters." Petitioners are certainly free to petition the agency for rulemaking when and if they alight on candidates for inclusion.

On the record at hand, we grant in part and deny in part petitioners' mandamus request and order the Coast Guard to conduct *prompt* rulemaking pursuant to § 4110 of the Act.

## I. Background

### A. The Oil Pollution Act of 1990

The OPA consists of nine distinct titles, two of which—Titles I and IV—constitute the bulk of the Act's provisions. Title I,

"Oil Pollution Compensation and Liability," contains extensive new provisions regarding the liability of parties responsible for an oil spill. *See* §§ 1001–1020, 104 Stat. at 486–506 (codified as amended at 33 U.S.C. §§ 2701–2719 (1994)). Included among these provisions is § 1017, which grants this court exclusive jurisdiction to review challenges to "any regulation promulgated under [the] Act." Section 1017 also imposes a 90–day jurisdictional time limit within which challenges to regulations must be brought. *See* § 1017(a), 104 Stat. at 504 (codified at 33 U.S.C. § 2717(a)). Title IV, "Prevention and Removal," for the most part amends existing statutory provisions, in many cases instructing the Secretary of Transportation, including the Coast Guard, to promulgate regulations for ensuring the prevention of oil spills. *See* §§ 4101–4306, 104 Stat. at 509–541 (codified in scattered sections of 46 U.S.C. (1994)). Two such preventative provisions are at issue in this case.

The first, § 4110, consists of two parts. *See* § 4110, 104 Stat. at 515 (codified at 46 U.S.C. § 3703 note). Section 4110(a) requires that the Coast Guard, no later than one year after enactment of the OPA, establish regulations setting "minimum standards" for TLPM devices. *See* § 4110(a), 104 Stat. at 515. Such devices would continually monitor the volume of oil contained in a tanker's hull and alert the crew to recognizable drops in the oil level, thereby signalling a potential leak. Section 4110(b) mandates that the Coast Guard, also no later than one year after enactment of the OPA, issue "regulations establishing . . . the use [by oil cargo ships] of . . . tank level and pressure monitoring devices, which are referred to in subsection (a) and which meet the standards established by the Secretary under subsection (a)." § 4110(b), 104 Stat. at 515. The Coast Guard has interpreted § 4110(b) to apply only to single, and not double, hulled tankers. *See* 46 C.F.R. § 32.22T–1(b) (1998). Petitioners do not challenge that interpretation here.

Section 4116(c), the second provision at issue here, requires that, not later than 6 months after enactment of the OPA, "the Secretary shall initiate issuance of regulations . . . to define those areas, *including* Prince William Sound, Alaska, and Rosario Strait and Puget Sound, Washington (including those portions of the Strait of Juan de Fuca east of Port Angeles, Haro Strait, and the Strait of Georgia subject to United States jurisdiction), on which single hulled tankers over 5,000 gross tons transporting oil in bulk shall be escorted by at least two towing vessels." § 4116(c), 104 Stat. at 523 (codified at 46 U.S.C. § 3703 note) (emphasis added). Thus, the Act names three areas specifically for which the Coast Guard must issue regulations.

**B. Rulemaking and Regulatory History of the Two Provisions**

Petitioners filed the present mandamus petition in December 1999, seeking to compel the Coast Guard to comply with its obligations under both § 4110 and § 4116(c) of the OPA. If the Coast Guard had simply disregarded both of the provisions, deciding instead to delay indefinitely any rulemaking under either section, this would be a straightforward case of unreasonable delay. What makes this case somewhat unusual, albeit not difficult, is the fact that the Coast Guard has episodically engaged in some rulemaking, and promulgated some regulations, pursuant to each of the provisions at issue. In order to put this case in proper perspective, we must first outline the curious history of agency actions purportedly taken pursuant to § 4110 and § 4116.

*1. § 4110–Overfill and Tank Level or Pressure Monitoring Devices*

Approximately three months before the statutorily-imposed deadline, the Coast Guard issued an advanced notice of proposed rulemaking seeking comments and suggestions regarding possible proposed rules for complying with §§ 4110(a) and (b). *See* 56 Fed.Reg. 21,116 (May 7, 1991).

The Coast Guard also commissioned a technical feasibility study of existing TLPM devices, released in early 1993, which confirmed that, as of 1993, "existing level detectors [were] not sufficiently sensitive to detect leakage before a large discharge occurr[ed]." Notice of Availability of Technical Feasibility Study, 58 Fed.Reg. 7,292, 7,292 col. 2 (Feb. 5, 1993). The study found that "attainable accuracy is expected to be within 1.0–2.0% of the actual level." *Id.* col. 3. Concerned that a 1.0 to 2.0 percent error margin, which translates to between 36,075 and 72,150 gallons of oil for a 400,000 ton tanker, would provide "insufficient warning to allow prompt action by the crew," the Coast Guard called for a public hearing to augment comments to the original advanced notice. *See* Notice of Public Meeting, 59 Fed.Reg. 58,810, 58,811 col. 2 (Nov. 15, 1994).

In its August 1995 notice of proposed rulemaking, the Coast Guard limited its proposed rule to the establishment of *standards* for TLPM devices pursuant to § 4110(a), leaving questions of *installation and use* of compliant devices, pursuant to § 4110(b), for another day. *See* 60 Fed. Reg. 43,427, 43,428–29 (Aug. 21, 1995). The Coast Guard proposed "that a leak detection device must sound an alarm before the contents of the tank decline to a level of 0.5 percent below the level at which the tank was loaded, or at the loss of 1,000 gallons of cargo, whichever is less." *Id.* at 43,429 col. 3. It chose this exacting standard, despite the technical feasibility study, because "[a] loss of 1,000 or more gallons in virtually all environments poses appreciable risk to the marine environment." *Id.* The Coast Guard acknowledged that "currently available devices may not meet the proposed standards for meaningful leak detection; however, establishing the standards may lead to development of devices which will provide appropriate leak detection." *Id.* col. 2.

In March 1997, nearly six years after the statutory deadline, the Coast Guard adopted the proposed standards in the form of a *temporary* rule, effective for two years beginning April 28, 1997. *See* 62 Fed.Reg. 14,828, 14,830–31 (March 28, 1997) (to be codified at 46 C.F.R. §§ 32.22T–1 & .22T–5). The rule did not require installation or use of TLPM devices unless and until § 4110(a) compliant technology had been invented and the appropriate § 4110(b) rulemaking undertaken. *See* 46 C.F.R. § 32.22T–1(c). In establishing the short two-year sunset, the Coast Guard cited its belief that "unless a tank level or pressure monitoring device is developed within 2 years from the effective date of [the] temporary rule, it may not be economically feasible to require installation of such a device considering phaseout schedules." 62 Fed.Reg. at 14,829 col. 3. All single-hulled vessels will be phased out of operation by the year 2010. *See* 46 U.S.C. § 3703a.

The temporary regulations did, in fact, sunset on April 28, 1999. In November of that year, the Coast Guard gave notice of completed action in the § 4110 TLPM rulemaking: "Because current technology can not create a device that can meet reasonable expectations, the temporary rule was allowed to expire, and no further action is required. If the Coast Guard ever receives information about a device that is accurate enough to meet the standard, the rulemaking will be reinitiated." 64 Fed.Reg. 64,739, 64,740 (Nov. 22, 1999). Thus, there are currently no regulations in place under either of § 4110's two provisions. Moreover, the Coast Guard never even attempted rulemaking pursuant § 4110(b).

### 2. § 4116(c)–Escorts for Certain Tankers

Nearly two years after passage of the OPA, the Coast Guard published a notice of proposed rulemaking. *See* 57 Fed.Reg. 30,058 (July 7, 1992). The proposed rule contemplated applying the dual-escort requirement only to those three areas specifically mentioned in § 4116(c) itself—namely, Prince William Sound, Rosario Strait,

and Puget Sound. *See id.* at 30,064 (proposed July 7, 1992) (to be codified at 33 C.F.R. pt. 168). The Coast Guard did, however, invite comments regarding "other waters" to which the dual-escort requirement might be extended: "The Coast Guard may require two escorts in other territorial waters of the United States. This notice does not propose additional areas. Any additional areas proposed will be included in a notice of proposed rulemaking and the public will be afforded an opportunity to comment." *Id.* at 30,060 col. 1. In the alternative, the Coast Guard suggested that it would consider "other waters" towing and escort requirements pursuant to the Ports and Waterways Safety Act of 1972, as amended by the Port and Tanker Safety Act of 1978 ("PWSA/PTSA"), under which "[t]he Coast Guard has significantly broader authority." *Id.* at 30,060 col. 2.

The Coast Guard issued a final rule in August of 1994. *See* 33 C.F.R. pt. 168 (1999). The final rule did not expand coverage beyond the statutorily-mentioned areas. In response to comments nominating additional waters besides those named, the Coast Guard stated simply that such comments "will be considered in *the separate 'other waters' rulemaking project.*" *See* Final Rule, 59 Fed.Reg. 42,962, 42,964 col. 2 (Aug. 19, 1994) (emphasis added). "The separate 'other waters' rulemaking project" presumably referred to an ongoing effort, initiated in 1993, to establish "other waters" escort requirements pursuant to the PWSA/PTSA. *See* Advanced Notice of Proposed Rulemaking, 58 Fed.Reg. 25,766 (April 27, 1993). The Coast Guard had chosen the PWSA/PTSA route, rather than § 4116(c)'s rigid two escort minimum, because "section 4116(c) provides no authority to require the use of escort vessels for ships other than laden, single-hulled oil tankers over 5,000 GT. In contrast, the PWSA has no such limitations." Request for Comments, 59 Fed.Reg. 65,741, 65,742 col. 3 (Dec. 21, 1994). To date, the Coast Guard has not promulgated final "other waters" escort requirements. It has since reiterated, however, that "[e]xtending escort requirements beyond the OPA 90 mandated areas is discretionary." Advanced Notice of Proposed PWSA Rulemaking, 63 Fed.Reg. 64,937, 64,939 col. 1 (Nov. 24, 1998).

## II. Jurisdiction

The instant litigation presents two distinct jurisdictional issues, one general and one specific to this case. Citing the Supreme Court's recent decision in *United States v. Locke,* 529 U.S. 89, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000), petitioners now suggest that § 1017(a)'s grant of exclusive jurisdiction to this court might apply only to actions challenging regulations promulgated pursuant to Title I, and not Title IV, of the OPA. As such, this court would not have original jurisdiction to hear petitioners' mandamus claims. *See Telecommunications Research and Action Ctr.,* 750 F.2d 70 (D.C.Cir.1984) [hereinafter *TRAC*]. For its part, the Coast Guard argues that § 1017(a) does apply, but that petitioners could have, and therefore should have, brought their mandamus claims as separate petitions for review of the earlier §§ 4110 and 4116(c) rulemakings. That being the case, the Coast Guard claims, petitioners cannot now circumvent § 1017(a)'s 90–day jurisdictional time limit for filing challenges to final agency action.

Petitioners are wrong in their suggestion that this court does not have exclusive jurisdiction over this case pursuant to § 1017. And the Coast Guard is wrong in its contention that petitioners' claims are untimely.

A. Scope of this court's exclusive jurisdiction under the OPA

■ Where a statute commits final agency action to review by this court, we also retain exclusive jurisdiction "to hear suits seeking relief that might affect [our] future statutory power of review." *TRAC,* 750 F.2d at 72. This includes mandamus

actions challenging an agency's unreasonable delay. *Id.* We must therefore determine whether the OPA vests this court with jurisdiction in the first instance to hear challenges to regulations, like those at issue here, promulgated pursuant to Title IV of the Act.

▮ Section 1017(a) of the OPA states: "Review of any regulation promulgated *under this Act* may be had upon application by any interested person only in the Circuit Court of Appeals of the United States for the District of Columbia." § 1017(a), 104 Stat. at 504 (emphasis added). On its face, the term "this Act" would seem to suggest broad application of the review provision to all titles of the OPA. Petitioners, however, point to a possible complication. The Supreme Court earlier this year held that § 1018's pre-emption savings clause–the provision immediately following § 1017 in Title I of the OPA–applied only to the pre-emptive effect of provisions like those contained in Title I, and not those contained in the remainder of the Act. *See Locke,* 529 U.S. at 104–06, 120 S.Ct. at 1146. Petitioners argue that, in so holding, the Supreme Court interpreted "this Act," as used *in* § 1018, to refer only to Title I of the OPA. Why, they ask, should it be interpreted more broadly in the context of § 1017(a)? Petitioners fundamentally misunderstand both the holding and reasoning of *Locke.*

*Locke* involved a claim that various federal oil cargo statutes, including the OPA, pre-empted the State of Washington's rules governing tanker vessel manning, operation, and design. The Court of Appeals had held that § 1018 of the OPA effectively saved *all* state tanker provisions from its, and the other statutes', pre-emptive reach. Section 1018 reads in pertinent part:

(a) Preservation of State Authorities ... Nothing *in this Act* or the Act of March 3, 1851 shall—

　(1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision

thereof from imposing any additional liability or requirements with respect to—

　(A) the discharge of oil or other pollution by oil within such State; or

　(B) any removal activities in connection with such a discharge;

· · ·

(c) Additional Requirements and Liabilities; Penalties. Nothing *in this Act* ... shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof—

　(1) to impose additional liability or additional requirements; or

　(2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law;

relating to the discharge, or substantial threat of a discharge, of oil.

§ 1018, 104 Stat. at 505–06 (codified at 33 U.S.C. § 2718) (emphasis added). Relying in large part on Congress' placement of the provision in Title I, the Supreme Court held that Congress intended these savings clauses only "to preserve state laws of a scope similar to the matters contained in Title I of OPA." *Locke,* 529 U.S. at 104–06, 120 S.Ct. at 1146. The Court's conclusion was "fortified" by § 1018(c)'s use of the phrase "relating to the discharge, or substantial threat of discharge, of oil," for Congress had used these same "key words" in declaring the scope of Title I. *Id.* (citing 33 U.S.C. § 2702(a), which codified § 1002(a), 104 Stat. at 489). In other words, Congress intended to save from pre-emption only those State laws having to do with liability and compensation regarding an oil spill. Because the State provisions at issue dealt with tanker manning, operation, and design, rather than liability and compensation, the Court concluded that they were subject to pre-emption. *Id.* at 108–14, 120 S.Ct. at 1148–50.

At no point in its analysis did the Court profess to interpret the phrase "this Act" or suggest that it was limited to Title I of the OPA. At no point did the Court hold that § 1018 disarmed the pre-emptive effect of Title I provisions alone. Rather, the Court merely held that § 1018 insulates only those state regulations of the *type* contained in Title I, whether it be from provisions contained in other titles of the OPA or any provision contained in one of the other named statutes. Because *Locke* gives us no reason to part from the natural interpretation of § 1017(a)'s "this Act," we turn now to the jurisdictional claims specific to this case.

B. Effect of earlier rulemakings on present mandamus action

1. *TLPM Device Challenge–§ 4110*

■ The Coast Guard asserts that its 1997 temporary, and now-expired, rulemaking constitutes its final word on § 4110. The Coast Guard said as much in its November 1999 Notice of Completed Action. The Government does not contend here that petitioners should have challenged the 1999 Notice of Completed Action, nor could it given § 1017(a)'s restriction on review to final regulations. Rather, the agency contends that petitioners' present mandamus action is tantamount to an untimely petition for review of the agency's completed 1997 temporary rulemaking. In other words, according to the Coast Guard, petitioners cannot now, over two years after the 1997 rulemaking, attempt to circumvent § 1017(a)'s jurisdictional 90–day filing limit by fashioning their petition as one for unreasonable delay. This is a specious argument and we reject it.

At the outset, it is important to recall what the 1997 temporary rulemaking did not do. The Coast Guard never addressed § 4110(b)'s distinct use and installation mandate, deferring any action on that front until compliant equipment had been identified. *See, e.g.,* 46 C.F.R. § 32.22T–1(c) ("During the effective period of this subpart no owner or operator is required to install any tank level or pressure monitoring device meeting the performance standards of this subpart unless required by the Coast Guard in a separate regulation."); 60 Fed.Reg. at 43,427 col. 3 ("Requirements for the installation and use of the devices will be proposed separately."). Nor did the Coast Guard make clear, at any point in the rulemaking, that it would not take further action pursuant to § 4110 upon expiration of the 1997 temporary regulations. Rather, the agency merely said that the "temporary rule [would] only be in effect for 2 years from the effective date." 62 Fed.Reg. at 14,829 col. 3.

The temporary regulations questioned whether, in light of phaseout schedules, it would be "economically feasible" to require installation of tank level and pressure monitoring devices if such devices were not developed within two years. *Id.* But this question was raised because the agency knew that the temporary regulations proposed very high standards, *i.e.,* standards that arguably embodied technology-forcing requirements that were beyond the current capacity of the affected industry. The Coast Guard never suggested, however, that the standards proposed in the temporary regulations were the *only* viable options to address the statutory mandate *compelling* the agency to establish some sort of rules as to both *compliance* standards and *use* requirements. Indeed, the *temporary* regulations were an experimental first-step toward achieving the required standards and requirements, nothing more, nothing less. They certainly did not forewarn anyone that the Coast Guard meant to say "this is it."

The Coast Guard is correct that petitioners cannot use the present mandamus action to challenge the substance of the 1997 temporary regulations. *See* In re *United Mine Workers of America Int'l Union,* 190 F.3d 545, 548 (D.C.Cir.1999); *Florida Power & Light Co. v. EPA,* 145 F.3d 1414, 1419 (D.C.Cir.1998). Petitioners are not, however, challenging anything that the

Coast Guard did in 1997. Nor do they challenge the Coast Guard's 1997 decision not to take certain actions or implement permanent regulations at that time. Rather, petitioners challenge what the Coast Guard has since failed to do: it has never established permanent § 4110(a) regulations; and it has put off, and now disregards, addressing § 4110(b)'s use and installation requirements.

 "[A]n agency's failure to regulate more comprehensively [than it has] is not ordinarily a basis for concluding that the regulations already promulgated are invalid." *Hazardous Waste Treatment Council v. EPA,* 861 F.2d 277, 287 (D.C.Cir.1988) [hereinafter *HWTC*]. Likewise, an agency's pronouncement of its intent to defer or to engage in future rulemaking generally does not constitute final agency action reviewable by this court. *See American Portland Cement Alliance v. EPA,* 101 F.3d 772, 777 (D.C.Cir.1996); *see also Florida P & L,* 145 F.3d at 1418 (establishing three-factor test for identifying reviewable "final" regulations). Nothing in § 1017(a), the OPA's judicial review provision, suggests departure from these general principles. With this in mind, petitioners argue that, had they challenged the deferral or "incompleteness" of the rules as the Coast Guard claims they should have, this court would have dismissed their petition on ripeness grounds. *See American Petroleum Inst. v. EPA,* 216 F.3d 50, 68–69 (D.C.Cir.2000) ("A decision to defer has no binding effect on the parties or on EPA's ability to issue a ruling in the future."); *HWTC,* 861 F.2d at 287 ("Unless the agency's first step takes it down a path that forecloses more comprehensive regulation, the first step is not assailable merely because the agency failed to take a second.").

We are guided by our recent *United Mine Workers* decision. There, the union sought an order compelling the agency to establish permissible exposure limits ("PELs") for diesel exhaust from mining equipment. The Mine Safety and Health Administration ("MSHA") argued, much as the Coast Guard does here, that the union should have raised the PEL issue in the context of an earlier equipment standards rulemaking. The court disagreed:

> From the outset, the agency disavowed any intention to consider new PELs for the diesel exhaust gases during its diesel equipment rulemaking, stating that the PELs would be reexamined as part of its omnibus air quality rulemaking. The UMWA does not take issue with that decision, or any other aspect of the diesel equipment rules. Although the PELs are plainly related to the equipment rules, since the latter incorporate them for certain equipment standards, the UMWA's challenge is to the content of the PELs and not to the agency's decision to incorporate them into the equipment rules. Indeed, had the UMWA challenged the diesel equipment rules on the ground that MSHA had failed to include revised PELs for diesel exhaust gases, we might well have denied its petition as premature.

*United Mine Workers,* 190 F.3d at 548–49 (citations omitted). Here, too, petitioners do not challenge the substance of the earlier regulations. Here, too, the Coast Guard clearly took only temporary, experimental action on § 4110(a) standards and deferred § 4110(b) use and installation regulations until compliant equipment had been located. By adopting a temporary § 4110(a) standard, the Coast Guard set in motion a two-year trial period during which such equipment might be invented. Petitioners could not have predicted that none would be found. Nor did petitioners have good reason to suppose that the absence of certain devices would result in no standards or requirements whatsoever.

Despite the express incompleteness of the temporary regulations, and despite any clear warning that it would abandon § 4110 rulemaking altogether following sunset, the Coast Guard argues that petitioners still should have construed the 1997 rulemaking as the agency's final action on

§ 4110. This is so, says the Coast Guard, because the statutory deadline for agency action had long since passed. This argument is wholly unconvincing.

The Coast Guard points us to *Hercules Inc. v. EPA,* 938 F.2d 276 (D.C.Cir.1991). There, we recognized a limited exception to the general rule against reviewing the incompleteness of a regulation: "when the statutory deadline for issuing regulations has passed, the promulgated regulation must be deemed the agency's 'complete response in compliance with the statutory requirements' ... [and] 'even if [the agency] promulgates additional ... rules sometime in the future, petitioners' claim that *existing* final regulations are unlawful remains reviewable by this court.'" *Id.* at 282 (emphasis in original) (quoting *Colorado v. Dep't of Interior,* 880 F.2d 481, 485–86 (D.C.Cir.1989)). Grabbing hold of the phrase "must be deemed," the Coast Guard attempts to turn § 4110's clear and long-passed deadlines—the very concern animating petitioners' complaints—on their head. This argument resting on *Hercules* fails.

In *Sierra Club v. EPA,* 992 F.2d 337 (D.C.Cir.1993), we held that passage of a statutory deadline rendered an agency's action final only when "the respondent agencies themselves considered their actions to be complete and sufficient responses to the relevant statutory requirements." *Id.* at 346. Though the statutory deadline for promulgating regulations had passed, the court held that,

> [f]ar from claiming that its actions are complete, the Agency explicitly states its intention to issue revised criteria for non-municipal facilities when it has the data necessary to do so. In such circumstances, it would be incongruous to categorize the Agency's rule as the 'final' regulation concerning the issue of non-municipal facilities.

*Id.* at 347. Likewise, in the present case, the 1997 temporary regulations explicitly stated the Coast Guard's intention to defer implementation of permanent § 4110(a) compliance standards and to delay rulemaking on § 4110(b) requirements.

In short, under *Sierra Club,* it is doubtful whether petitioners could have challenged the 1997 temporary regulations, for such a challenge would have appeared premature. But this really is beside the point in this case. Petitioners do not here challenge the 1997 temporary regulations, either for what they did or did not do; those regulations have expired. Whatever issues could have been raised regarding their legality are moot. What is at issue in this case is the *absence of any regulations* under § 4110. The statute *compels* the agency to establish both compliance standards and use requirements. There are no such standards or requirements in existence–none–and the agency has no present intention to promulgate any. Petitioners argue, rather convincingly, that the agency's current "we-will-not-promulgate-regulations" position is a blatant violation of the Act. That is the question that is before this court. The issues that petitioners have raised are timely and they are fully cognizable in connection with their request for mandamus relief.

### 2. *"Other Waters" Challenge–§ 4116(c)*

█ Petitioners interpret the use of the term "including" in § 4116(c) to require the Coast Guard to initiate rulemaking to define "other waters" to be included with the three named areas for which dual-escort towing regulations must be implemented. Though the Coast Guard, by its 1994 rulemaking, established final dual-escort requirements for the specifically-named areas, it has not yet initiated rulemaking extending the requirements to "other waters." Petitioners challenge this ongoing failure. As with § 4110, the Coast Guard argues that petitioners should have brought the present challenge in a petition for review of the earlier § 4116(c) rulemaking. For many of the reasons articulated above, we again disagree—petitioners are not challenging the 1994 rulemaking, but rather the Coast

Guard's failure to follow through on expressly deferred and, petitioners argue, mandated promises. Petitioners' challenge is not untimely. We take up the issue of whether § 4116(c) indeed contains such an "other waters" requirement in the next section.

### III. Merits

 Our consideration of any and all mandamus actions starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act. In the case of agency inaction, we not only must satisfy ourselves that there indeed exists such a duty, but that the agency has "unreasonably delayed" the contemplated action. *See* Administrative Procedure Act, 5 U.S.C. § 706(1) (1994); *see also* 5 U.S.C. § 555(b) (1994). This court analyzes unreasonable delay claims under the now-familiar criteria set forth in *TRAC*:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*United Mine Workers*, 190 F.3d at 549 (quoting *TRAC*, 750 F.2d at 80). We take §§ 4110 and 4116 in reverse order.

 We disagree with petitioners that, by using the term "including" before the three specifically-named areas, § 4116(c) places a clear and mandatory duty on the Coast Guard to undertake "other waters" rulemaking. Petitioners do not provide any parameters or criteria for the hypothetical set of "other waters." Must it contain only one unnamed area? Two? When asked at oral argument, counsel for petitioners could not identify a single additional area compelled by § 4116(c), nor could we have countenanced one had they done so. Petitioners' utter inability to give a coherent account of what a mandamus order might look like belies their assertion that the provision in fact contains a clear, non-discretionary duty to act. As with similar listing "requirements," petitioners remain free to petition the Coast Guard for a rulemaking to add particular "other waters" should it alight on justifiable reasons for so doing. Denial of such a petition would then be subject to review.

 Sections 4110(a) and (b) stand in stark contrast to § 4116(c). The statute indisputably commands the Coast Guard to establish *some sort of* compliance standards *and* use requirements *by August 1991*. There are no such standards or requirements, and the Coast Guard has disavowed any further action. The Coast Guard contends only that any attempt now to promulgate compliance standards and use requirements will run into the same *practical problems encountered in the 1997 rulemaking*—namely, that no equipment currently exists to meet the necessary standards. This argument misses the point.

Section 4110(a) commands the Coast Guard to establish compliance standards. There are none. And § 4110(b) commands the Coast Guard to establish requirements regarding the installation and use of compliant equipment. There are none. The agency cannot avoid these commands by pointing to too-stringent compliance standards that have expired. Neither the Coast Guard in its prior rulemakings, nor government counsel at argument, dispute that functioning TLPM devices are available on the market. Nor, as a result, do

they dispute that *some sort of* minimum § 4110(a) standard is possible—whether it be a less-stringent numbers standard or a simple technology-based standard.

The Coast Guard has not disputed petitioners' arguments regarding the specific *TRAC* factors, and we do not pause to analyze them. Suffice it to say that all favor granting mandamus: a nine-year delay is unreasonable given a clear one-year time line and the Coast Guard's admission that it will do no more; the delayed regulations implicate important environmental concerns; and the Coast Guard has not shown that expedited rulemaking here will interfere with other, higher priority activities. We will, therefore, retain jurisdiction over the case until final agency action disposes of the Coast Guard's obligations under § 4110 of the OPA.

Mandamus pursuant to *TRAC* is an extraordinary remedy, reserved only for extraordinary circumstances. This is just such a circumstance. We are here faced with a clear statutory mandate, a deadline nine-years ignored, and an agency that has admitted its continuing recalcitrance. For the foregoing reasons, we hereby direct the Coast Guard to undertake prompt § 4110 rulemaking.

*So ordered.*