# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 21, 2005      Decided January 17, 2006

No. 05-5032

THE WILDERNESS SOCIETY,
APPELLANT

v.

GALE A. NORTON,
SECRETARY OF THE UNITED STATES
DEPARTMENT OF THE INTERIOR, AND
FRAN MAINELLA, DIRECTOR NATIONAL PARK SERVICE,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 03cv00064)

*Craig S. Coleman* argued the cause for appellant. With him on the briefs were *Brian B. O'Neill*, *Richard A. Duncan*, *Jonathan W. Dettmann*, and *Leslie L. Jones*.

*Lisa E. Jones*, Attorney, U.S. Department of Justice, argued the cause for appellees. On the brief were *David C. Shilton* and *Anna T. Katselas*, Attorneys.

Before: GARLAND, *Circuit Judge,* and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The Wilderness Society ("TWS" or the "Society") filed suit in the United States District Court for the District of Columbia. The complaint alleges that the National Park Service ("NPS" or the "Park Service") has chronically failed to undertake various legal obligations with respect to the identification and management of "wilderness" in the National Park System. TWS seeks judicial redress to compel the agency to take actions that allegedly have been unlawfully withheld and unreasonably delayed. On January 10, 2005, the District Court granted relief with respect to five of the Society's claims, but dismissed the remaining 39 counts alleged in TWS' complaint. TWS appealed the dismissals. The Government did not file a cross-appeal.

At issue here are TWS' claims that NPS has failed to comply with certain statutory mandates and deadlines and also failed to adhere to certain management policies. We dismiss the majority of TWS' claims for want of Article III standing. And we deny TWS' non-statutory claims resting on NPS' alleged failure to develop wilderness management plans, because they are predicated on unenforceable agency statements of policy.

## I. BACKGROUND

On January 15, 2003, TWS filed suit against Gale Norton in her official capacity as Secretary of the Interior and Fran Mainella in her official capacity as Director of NPS. Specifically, TWS "allege[d] a widespread disregard by NPS of its statutory and regulatory duties to take specific actions to review and protect wilderness-quality lands in the National Park System, in violation of the Wilderness Act, 16 U.S.C. §§ 1131-36, the National Park Service Organic Act, 16 U.S.C. §§ 1-18f-3, National Park Service Policies and Directives, and the [Administrative Procedure Act]." *Wilderness Soc'y v. Norton*,

CA No. 03-64, 2005 U.S. Dist. LEXIS 18734, at *2 (D.D.C. Jan. 10, 2005) (emphases omitted).

The facts surrounding TWS' allegations are discussed at length in the District Court's Memorandum Opinion, so we will not repeat the full statement of facts here. Suffice it to say that "The Wilderness Society . . . filed a 94-page, 44-count complaint against the [NPS] . . . for alleged failures to conduct wilderness assessments, forward wilderness recommendations to the President, prepare wilderness management plans, revisit legally-insufficient wilderness assessments, and otherwise to take required measures to protect wilderness resources in this country." *Id.* at *1. In alleging that NPS has failed to prepare wilderness management plans, TWS relies on internal agency policies found in NATIONAL PARK SERVICE, DEPARTMENT OF INTERIOR, NPS D1416, MANAGEMENT POLICIES 2001 (Dec. 2000) ("MANAGEMENT POLICIES" or "POLICIES"), *available at* http://www.nps.gov/refdesk/mp/. *See also* Director's Order #41 and NPS Reference Manual #41, *available at* http://www.nps.gov/applications/npspolicy/DOrders.cfm. TWS' suit is based upon § 706(1) of the Administrative Procedure Act ("APA"), which permits a court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1) (2000). *Wilderness Soc'y*, 2005 U.S. Dist. LEXIS 18734, at *2.

On July 30, 2003, NPS filed a motion for judgment on the pleadings, *see* FED. R. CIV. P. 12(c), arguing, *inter alia*, that the Society lacks Article III standing; that TWS' claims regarding certain statutory deadlines are time-barred; and that the MANAGEMENT POLICIES cited by TWS embodies *nonbinding* declarations of policy issued solely to guide NPS managers and staff in their duties. On January 10, 2005, the District Court granted the Government's motion for judgment on the pleadings as to all but five counts. *Wilderness Soc'y*, 2005 U.S. Dist. LEXIS 18734, at *70-71. The District Court dismissed the

counts under the Wilderness Act and the specific enabling statutes as time-barred pursuant to 28 U.S.C. § 2401(a) (2000), the six-year statute of limitations for civil actions brought against the United States. *Wilderness Soc'y*, 2005 U.S. Dist. LEXIS 18734, at *24-25. The remaining claims were rejected for want of merit under 5 U.S.C. § 706(1). *Id.* at *46-47. TWS filed a timely notice of appeal, challenging the District Court's dismissal of its statutory claims and denial of relief on the bulk of its claims arising under the MANAGEMENT POLICIES. The Government did not cross-appeal the orders covering the five claims on which relief was granted to TWS. And at oral argument before this court, the Government acknowledged that NPS is presently complying with the District Court's orders relating to these five claims and conceded that no review was properly sought on these matters.

## II. ANALYSIS

### A. *Statute of Limitations*

The District Court dismissed TWS' claims under the Wilderness Act and the specific enabling statutes as time-barred under 28 U.S.C. § 2401(a). Section 2401(a) provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." The District Court ruled that the Society's claims based on violations of the Wilderness Act, 16 U.S.C. § 1132(c) (2000), the Big Cypress National Preserve Addition Act, 16 U.S.C. § 698*l* (2000), the Glen Canyon National Recreation Area Enabling Act, 16 U.S.C. § 460dd-8 (2000), and the California Wilderness Act, Title VI, § 602, Pub. L. No. 103-433, 108 Stat. 4496-97 (1994), were untimely, because each claim was brought more than six years after NPS failed to meet its statutory deadline to perform wilderness reviews or file and complete legal boundary maps.

The Society appeals this ruling on the grounds that the statute of limitations has not run, because NPS is in continuous violation of its statutory obligations. TWS also points out that this court has never applied 28 U.S.C. § 2401(a) in situations comparable to this case in which a claimant has filed for mandamus to "compel agency action unlawfully withheld or unreasonably delayed." The Government offers no response and, noticeably, it does not attempt to defend the District Court's decision.

Although we need not reach a final determination on this issue because we find TWS lacks standing as to its statutory claims, the Society appears to be right in its contention that the District Court erred in dismissing the counts under the Wilderness Act and the specific enabling statutes as time-barred under 28 U.S.C. § 2401(a). This court has repeatedly refused to hold that actions seeking relief under 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed" are time-barred if initiated more than six years after an agency fails to meet a statutory deadline. For example, in *In re United Mine Workers of America International Union*, 190 F.3d 545 (D.C. Cir. 1999), the petitioner sought a writ of mandamus to compel a division of the Department of Labor to issue final regulations. The statute required the Secretary of Labor to promulgate final regulations, or explain her decision not to promulgate them, within 90 days of a specified date. *Id*. at 550. The suit was brought eight years after the agency failed to meet its deadline. *Id*. The court nonetheless rejected the agency's contention that the suit was time-barred. The court ruled that, "[b]ecause the [union] does not complain about what the agency has done but rather about what the agency has yet to do, we reject the suggestion that its petition is untimely." *Id*. at 549.

The decision in *In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000), is to the same effect. There the court noted that the statute "command[ed] the Coast Guard to establish

compliance standards. There are none." *Id*. at 1315. The court also noted that it was "faced with a clear statutory mandate, a deadline nine-years ignored, and an agency that has admitted its continuing recalcitrance." *Id*. at 1316. Notwithstanding that the statutory deadline had been missed by nine years, the court found the petition was timely. *Id*. at 1314.

TWS claims that NPS has chronically failed to undertake various legal obligations with respect to the identification and management of "wilderness" in the National Park System. The Society's complaint alleges continuing violations by the Government. It "does not complain about what the agency has done but rather about what the agency has yet to do," *United Mine Workers*, 190 F.3d at 549. Under these circumstances, it is unlikely that TWS' complaint would be held by this court to be time-barred by 28 U.S.C. § 2401(a).

## B. *TWS' Standing*

We cannot address the merits of TWS' claims, however, unless we are assured that the Society has Article III standing. *See Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir.), *merits reviewed,* 406 F.3d 689 (D.C. Cir. 2005). TWS may bring suit in a representational capacity on behalf of its members if:

> (1) at least one of [its] members has standing to sue in his or her own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit.

*Id.* On the record here, TWS has failed to satisfy the first standard with respect to all but its non-statutory claims resting on NPS' alleged failure to develop wilderness management plans.

The Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), explained that

> the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61 (internal citations, alterations, and quotation marks omitted). In order to establish standing, TWS must demonstrate, as to each of its claims, that at least one member meets the requirements of *Lujan*. It has failed to do this with respect to all but its non-statutory claims resting on NPS' alleged failure to develop wilderness management plans.

The Government argues that the affidavits and declarations filed by TWS fail to establish injury in fact. The majority, they argue, offer nothing more than conclusory assertions that NPS' failure to comply with its wilderness mandates injures the member because it results in degradation of the wilderness areas he or she frequents. The remaining declarations, according to the Government, are insufficiently specific in their pleadings. The Government argues further that, even assuming injury in fact, the Society cannot establish that its members' injuries are fairly traceable to NPS' alleged failures to act, or that compelling NPS to take the actions TWS requests would redress these injuries. We agree that, as to all but its non-statutory claims resting on NPS' alleged failure to develop wilderness

management plans, TWS has failed to demonstrate injury in fact or redressability.

Harms to aesthetic and recreational enjoyment of parks may suffice to create injury for Article III purposes. *See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972). "But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.* at 734-35. The declarations submitted by TWS do not, in most instances, demonstrate particularized and concrete injuries necessary to establish Article III standing.

For example, one such declaration states:

I want the undeveloped land assessed for wilderness suitability in Chaco Culture National Historical Park to prevent future uses of the land that would be incompatible with my enjoyment of the Park and the NPS' mandate to preserve lands it manages "unimpaired for the use and enjoyment of future generations." Among such potential impairments could be proposals for power line rights-of-way, transmission towers for communication sites, and new roads. I will suffer imminent and irreparable harm if the NPS does not comply with its duty.

Plaintiff's Memorandum in Response to Defendants' Motion for Judgment on the Pleadings, Exhibit F ("Ex. F"), Buono Decl. ¶ 6, *Wilderness Soc'y v. Norton*, CA No. 03-64 (D.D.C. Jan. 10, 2005). Such "'general averments' and 'conclusory allegations' [are] inadequate." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (internal citation omitted).

Not all of the declarations submitted by the Society are infirm in their allegations of concrete and particularized injury. This does not help TWS, however. Even when injury in fact is demonstrated and the alleged injuries are fairly traceable to NPS' failure to comply with its statutory obligations, TWS has

failed to show that it is "likely, as opposed to merely speculative, that the injur[ies] will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal citations and quotation marks omitted).

The redressability inquiry poses a simple question: "[I]f plaintiffs secured the relief they sought, . . . would [it] redress their injury"? *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1233 (D.C. Cir. 1996). TWS seeks three types of relief with respect to which it cannot show redressability. First, in relation to two parks, Glen Canyon National Recreation Area and Lake Mead National Recreation Area, TWS asks the court to order NPS to forward its completed wilderness recommendations to the President. Second, the Society asks for an order compelling the Park Service to complete a legal description and wilderness boundary map of designated wilderness in Death Valley National Park. Third, TWS seeks an order to compel the agency to complete wilderness suitability assessments for 11 parks. Because TWS is required to "demonstrate standing separately for each form of relief sought," *Friends of the Earth*, 528 U.S. at 185, we consider its standing in relation to each of these requests in turn, focusing specifically on the question of redressability. And, as to each claim, we hold that appellant lacks standing for want of redressability.

### 1. NPS' Alleged Failure to Forward Reports to the President

TWS seeks an order requiring NPS to forward to the President the agency's completed wilderness recommendations for Glen Canyon National Recreation Area and Lake Mead National Recreation Area. There is no good reason to believe that such an order will redress TWS' injuries. No legal consequences flow from the recommendations. Even if this court were to order NPS to forward its recommendations to the President, it would still be up to Congress to decide whether to

designate the cited lands as wilderness. *See* 16 U.S.C. § 1132(c) (Wilderness Act); 16 U.S.C. § 460dd-8 (Glen Canyon National Recreation Area Reporting Provision).

Congress has no obligation to consider the President's recommendations, should he offer any, let alone act upon them. And no order from this court requiring NPS to submit recommendations to the President in the hope that he will in turn forward them to Congress will change this situation. *See Guerrero v. Clinton*, 157 F.3d 1190, 1191 (9th Cir. 1998) (holding where "reports [to Congress] themselves trigger no legal consequences," any injury allegedly incurred by the absence of reporting "is . . . not redressable"). In short, the judicial order that TWS requests will not afford it the redress it seeks.

### 2. NPS' Alleged Failure to Complete a Legal Description and Boundary Map for Death Valley National Park

TWS similarly cannot establish redressability with respect to its request for an order compelling NPS to complete a legal description and boundary map of designated wilderness in Death Valley National Park. In other words, the member injuries cited by TWS will not be redressed by the relief requested.

TWS submitted the declaration of Ms. Wold, which asserts that she is a member of TWS and that she spends significant time in Death Valley National Park. Ex. F, Wold Decl. ¶¶ 1, 4. The declaration states further that, in December 2002, Ms. Wold and her family had planned five park adventures for the coming year. *Id.* ¶ 4. The declaration identifies the particular parts of the park that Ms. Wold has frequented in the past, as well as the areas that she plans to frequent over the next year. *Id.* Ms. Wold then asserts the following purported injuries:

> I want the Park [Service] to fulfill its obligations to complete final boundary maps and wilderness legal

descriptions for Death Valley National Park in order to prevent uses of the land that are incompatible with my enjoyment of the Park. Off-road vehicle (ORV) ingress is a constant threat to the Park. A Toyota 4WD vehicle was abandoned in Butte Valley, located in the Park, the last time we were hiking in the area. Abandoned vehicles and vehicle parts have violated the beauty of park areas like Surprise Canyon [an area of Death Valley she has frequented], and its delicate riparian area.

. . . .

NPS's failure to comply with its wilderness responsibilities harms my ability to use and enjoy Death Valley National Park as wilderness because most citizens do not realize that 95% of the park was designated as wilderness on October 31, 1994. Without maps, to most people with 4WD vehicles, a dirt tract is a road to be traveled – and travel it they will.

*Id.* ¶¶ 7, 9.

It simply defies reason to think that a court order compelling NPS to issue final boundary maps and legal descriptions of Death Valley National Park will reduce off-road vehicle abuses of the wilderness. Indeed, 95% of the park already has been designated "wilderness," so the identification of protected areas is hardly an issue of any moment. There is no reason to believe (and TWS cites none) that maps and descriptions of the park will curb off-road vehicle abuses. TWS has thus failed to show that it is "likely, as opposed to merely speculative," that the injuries cited by Ms. Wold "will be redressed by a favorable decision" on this issue. *Lujan*, 504 U.S. at 561 (internal citations and quotation marks omitted).

### 3. NPS' Alleged Failure to Review Lands for Wilderness Suitability

TWS also seeks a court order compelling NPS to review lands for wilderness suitability pursuant to 16 U.S.C. § 1132(c) in the Wilderness Act. Section 1132(c) states:

> Within ten years after September 3, 1964 the Secretary of the Interior shall review every roadless area of five thousand contiguous acres or more in the national parks, monuments and other units of the national park system and every such area of, and every roadless island within the national wildlife refuges and game ranges, under his jurisdiction on September 3, 1964 and shall report to the President his recommendation as to the suitability or nonsuitability of each such area or island for preservation as wilderness. The President shall advise the President of the Senate and the Speaker of the House of Representatives of his recommendation with respect to the designation as wilderness of each such area or island on which review has been completed, together with a map thereof and a definition of its boundaries. Such advice shall be given with respect to not less than one-third of the areas and islands to be reviewed under this subsection within three years after September 3, 1964, not less than two-thirds within seven years of September 3, 1964 and the remainder within ten years of September 3, 1964. A recommendation of the President for designation as wilderness shall become effective only if so provided by an Act of Congress. Nothing contained herein shall, by implication or otherwise, be construed to lessen the present statutory authority of the Secretary of the Interior with respect to the maintenance of roadless areas within units of the national park system.

16 U.S.C. § 1132(c). TWS points out that special protections are afforded "wilderness" areas, *see* 16 U.S.C. § 1133, and that these protections would redress the Society's injuries. The

problem, however, is that it is clear from 16 U.S.C. § 1132(c) that only Congress can designate lands as wilderness.

Unsurprisingly, TWS argues that the likelihood of an area attaining "wilderness" designation is increased if NPS or the Secretary of Interior submit a suitability recommendation to the President, who in turn may then submit a recommendation to Congress. The analysis is too attenuated, however. As noted above, an order from this court requiring NPS to submit recommendations to the President in the hope that he will in turn forward them to Congress does not make it "likely, as opposed to merely speculative," that the injuries cited by TWS "will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal citations and quotation marks omitted).

TWS fares no better with reference to the individual park enabling acts or the MANAGEMENT POLICIES itself. NPS has no final authority under these acts to designate an area as wilderness. *See, e.g.*, Big Cypress National Preserve Addition Act, 16 U.S.C. § 698*l*. An order from this court cannot make Congress designate an area as wilderness, so the redress that TWS seeks cannot be found with the judiciary. A suitability assessment undertaken pursuant to the MANAGEMENT POLICIES similarly does not create a designation as wilderness.

TWS responds that, under the agency's POLICIES, NPS has committed itself to managing areas as if they are wilderness once it commences to review lands for wilderness suitability. TWS points us to § 6.3.1 of the MANAGEMENT POLICIES, which states, in part, that "[NPS] will take no action that would *diminish the wilderness suitability* of an area possessing wilderness characteristics until the legislative process of wilderness designation has been completed." MANAGEMENT POLICIES, § 6.3.1, *supra*, at 65 (emphasis added). We do not view this policy statement as a commitment by NPS to manage areas as if they *are wilderness* once the agency commences

review of lands for wilderness suitability.  And there is certainly no statutory or case law support for this contention.

More importantly, even under the policy statement cited by TWS, it is clear that NPS has wide discretion to decide how to proceed to "take no action that would diminish the wilderness suitability of an area possessing wilderness characteristics." *Id*. TWS has not demonstrated that an order from this court compelling NPS to review lands for wilderness suitability would change NPS' management of the land in ways that would redress the injuries its members allege.  For example, TWS has not shown that various types of motorized vehicles which allegedly degrade the wilderness that its members use would be prohibited by NPS so as not to diminish wilderness suitability. The point is that the existence of various nonconforming uses, such as logging, farming, mining, and even utility lines, in some situations, on lands possessing wilderness characteristics does not *per se* preclude a recommendation from the Park Service that the area is wilderness suitable and should be designated as wilderness. *See* MANAGEMENT POLICIES, § 6.2.1.2, *supra*, at 64.

In short, TWS has not shown that NPS has committed itself to managing areas as if they are wilderness once it commences a review of lands for wilderness suitability.  Had the Wilderness Act provided that NPS must manage wilderness-suitable areas as if they were designated wilderness, *i.e.*, conforming to the prohibitions and protections of the Wilderness Act, then TWS' alleged injuries might have been redressable.  Nothing in the statute, however – indeed, nothing in the MANAGEMENT POLICIES – requires this.

Put differently, TWS lacks standing because it has not presented a situation comparable to those covered by *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*").  In a paradigmatic *TRAC* case, a petitioner seeks to compel agency action that the petitioner claims is legally required and that directly affects the

party before the court. When the agency then acts pursuant to a *TRAC* order, the petitioner will either secure the redress sought or have a final order on the merits from the agency that will be subject to judicial review. This case would be covered by *TRAC* if, hypothetically, TWS' claim arose because the agency had failed to comply with a statutory provision under the Wilderness Act requiring NPS to make a determination on the merits of a concrete wilderness proposal within a precise time frame and a positive determination would redress the particularized injuries of TWS' members. We have no such situation here.

## C. *The Non-Statutory Claims Relating to NPS' Alleged Failure to Promulgate Management Plans*

Finally, TWS requests this court to order the agency to provide public notice and complete wilderness management plans in accordance with § 6.3.4.2 of the MANAGEMENT POLICIES. In advancing this claim, TWS focuses on four parks that have been designated as wilderness by Congress, three that are in various stages of the designation process, and one that is partially designated and partially in the process of designation.

The POLICIES provides, in pertinent part:

The superintendent of each park containing wilderness resources will develop and maintain a wilderness management plan or equivalent planning document to guide the preservation, management, and use of these resources. The wilderness management plan will identify desired future conditions, as well as establish indicators, standards, conditions, and thresholds beyond which management actions will be taken to reduce human impacts to wilderness resources.

. . . Wilderness management plans will be supported by appropriate documentation of compliance with NEPA and NHPA. The plan will be developed with public involvement, and will contain specific, measurable

management objectives that address the preservation and management of natural and cultural resources within wilderness as appropriate to achieve the purposes of the Wilderness Act and other legislative requirements.

MANAGEMENT POLICIES, § 6.3.4.2, *supra*, at 66; *see id.* § 6.3.1, *supra*, at 65 ("For the purposes of applying these policies, the term 'wilderness' will include the categories of suitable, study, proposed, recommended, and designated wilderness."); *accord* NPS Reference Manual #41, *supra*, at 32.

TWS' request for an order compelling NPS to create management plans, unlike its other claims, does not fail for want of standing. TWS' member affidavits covering the cited parks are, for the most part, sufficient to establish injury in fact. These affidavits aver that the members' use and enjoyment of the parks in question have been impaired by the degradation of these lands. *See, e.g.*, Ex. F., Wold Decl. ¶¶ 7, 9; Ex. F., McNulty Decl. ¶ 6. Moreover, the injuries cited are fairly traceable to NPS. That is, insofar as it is reasonable to assume that enforced regulations would affect how the parks are used and maintained, the agency's alleged failures to regulate and manage the disputed land areas through wilderness management plans are the causes of the alleged degradation of these lands. *See Mountain States Legal Found.*, 92 F.3d at 1234-35 (allegation that government's choice among several alternatives for timber harvesting in national forest resulted in under-regulation and thereby created an increased risk of catastrophic wildfire was found not speculative). And it is not unreasonable to assume that a court order compelling NPS to create viable management plans would redress many of the injuries allegedly suffered by TWS members.

We therefore conclude that TWS has Article III standing to pursue claims resting on the agency's alleged failure to comply with § 6.3.4.2 of the MANAGEMENT POLICIES. It does not matter whether, in the end, TWS' claims lack merit. A defect in the

merits of a party's claim is not the basis upon which to determine standing. And "no court in the modern era has treated a garden-variety substantive defect in [a party's] claim as defeating redressability." *Mountain States Legal Found.*, 92 F.3d at 1234.

Although we find that TWS has standing to pursue its challenge to NPS' failure to develop management plans, we hold that these claims fail on the merits. The only ground offered by TWS to support its claim that NPS is legally obliged to provide management plans is § 6.3.4.2 of the MANAGEMENT POLICIES. The Government contends that the POLICIES does not embody rules that are enforceable against the agency; rather, according to the Government, the POLICIES provides only internal guidance for NPS managers and staff. We agree.

TWS argues that the binding nature of the POLICIES was settled in *Davis v. Latschar*, 202 F.3d 359 (D.C. Cir. 2000). We are unconvinced. In *Davis*, the court accepted an "assertion" that NPS intended to be bound by the MANAGEMENT POLICIES, because the assertion was uncontested. *Id.* at 366 n.4. The matter was not in dispute, so the court had no occasion to render a final judgment on the issue. The issue is squarely posed in this case, however, and the Government strenuously argues that the agency did not intend to establish binding rules when it promulgated the MANAGEMENT POLICIES.

In determining whether an agency has issued a binding norm or merely a statement of policy, we are guided by two lines of inquiry. "One line of analysis focuses on the effects of the agency action," asking whether the agency has "(1) 'impose[d] any rights and obligations,' or (2) 'genuinely [left] the agency and its decisionmakers free to exercise discretion.'" *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam)). "[T]he language actually used by the agency" is often central to making such determinations. *Cmty.*

*Nutrition Inst.*, 818 F.2d at 946. "The second line of analysis focuses on the agency's expressed intentions." *CropLife Am.*, 329 F.3d at 883. The analysis under this line of cases "look[s] to three factors: (1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999). Under either line of analysis, the MANAGEMENT POLICIES is a statement of policy, not a codification of binding rules.

While the text of the POLICIES on occasion uses mandatory language, such as "will" and "must," the document as a whole does not read as a set of rules. It lacks precision in its directives, and there is no indication of how the enunciated policies are to be prioritized.

It is particularly noteworthy that NPS did not issue its MANAGEMENT POLICIES through notice and comment rulemaking under 5 U.S.C. § 553 of the APA. Although the agency twice gave notice in the Federal Register of proposed policies, it never published a final version of the POLICIES in either the Federal Register or, more significantly, in the Code of Federal Regulations.

> *Failure* to publish in the Federal Register is indication that the statement in question was *not* meant to be a regulation since the [APA] requires regulations to be so published. The converse, however, is not true: *Publication* in the Federal Register does *not* suggest that the matter published *was* meant to be a regulation, since the APA requires general statements of policy to be published as well. The real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents "having general applicability *and legal effect*," and which the governing regulations provide shall contain

only "each Federal *regulation* of general applicability and current or future effect."

*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538-39 (D.C. Cir. 1986) (internal citations omitted). The MANAGEMENT POLICIES never has been published in the Code of Federal Regulations.

The agency's characterization of the MANAGEMENT POLICIES in the Federal Register is also telling. In its January 2000 announcement that a draft document was ready for public comment, the agency explained that "[p]ark superintendents, planners, and other NPS employees use management policies as a reference source when making decisions that will affect units of the national park system." Notice of Availability of Draft National Park Service Management Policies, 65 Fed. Reg. 2984 (Jan. 19, 2000). This statement is consistent with the Introduction to the POLICIES which makes it clear that the agency has retained unfettered discretion to act as it sees fit with respect to the actions outlined in the POLICIES, including the development of wilderness management plans. The Introduction states:

> Adherence to policy is mandatory unless specifically waived or modified in writing by the Secretary, the Assistant Secretary, or the Director.

MANAGEMENT POLICIES, Introduction, *supra*, at 5. This language does not evidence an intent on the part of the agency to limit its discretion and create enforceable rights. Rather, the agency's top administrators clearly reserved for themselves unlimited discretion to order and reorder all management priorities. This supports the Government's contention that the POLICIES is no more than a set of internal guidelines for NPS managers and staff.

Finally, it is significant that TWS points to no statutory provision requiring NPS to develop wilderness management

plans. Neither the Wilderness Act nor the agency's organic act requires wilderness management plans. The fact that the MANAGEMENT POLICIES does not emanate from a congressional mandate further supports the conclusion that it was not meant to establish binding norms.

We find that, on the basis of the foregoing considerations, the conclusion is inescapable that the MANAGEMENT POLICES is a nonbinding, internal agency manual intended to guide and inform Park Service managers and staff. There is no indication that the agency meant for these internal directives to be judicially enforceable at the behest of members of the public who question the agency's management. For us to hold otherwise on this record would not only be contrary to our case law, but it would chill efforts by top agency officials to gain control over their bureaucratic charges through internal directives. In sum, the MANAGEMENT POLICIES is exactly what it appears to be, a guidance manual for NPS managers and staff that does not create enforceable regulations or modify existing legal rights.

### III. CONCLUSION

For the reasons indicated above, we hereby dismiss the majority of TWS' claims for want of Article III standing, and we deny TWS' remaining non-statutory claims because they are predicated on unenforceable agency statements of policy.

The Government did not cross-appeal the District Court's orders covering five claims on which relief was granted to TWS. We offer no judgment on these matters. Government counsel acknowledged that NPS is presently complying with the District Court's orders relating to these five claims and conceded that no review was properly sought on these matters.

*So ordered.*