# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 20, 2012        Decided April 6, 2012

No. 11-1106

AKM LLC, DOING BUSINESS AS VOLKS CONSTRUCTORS,
PETITIONER

v.

SECRETARY OF LABOR, DEPARTMENT OF LABOR AND
OCCUPATIONAL SAFETY & HEALTH REVIEW COMMISSION,
RESPONDENTS

On Petition for Review of a Final Order of the
Occupational Safety & Health Review Commission

*Arthur G. Sapper* argued the cause for petitioner. On the
briefs was *Michael S. Nadel*.

*Elizabeth Gaudio* was on the brief for *amicus curiae*
National Federation of Independent Business Small Business
Legal Center in support of petitioner.

*Heather R. Phillips*, Attorney, U.S. Department of Labor,
argued the cause for respondent. With her on the brief were
*Joseph M. Woodward*, Associate Solicitor, and *Robert W.
Aldrich*, Attorney.

Before: HENDERSON, GARLAND, and BROWN, *Circuit
Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Opinion concurring in the judgment filed by *Circuit Judge* GARLAND.

Concurring opinion filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: OSHA cited and fined petitioner, Volks Constructors, for failing to properly record certain workplace injuries and for failing to properly maintain its injury log between January 2002 and April 2006. OSHA issued the citations in November 2006, which was, as Volks points out, at least six months after the last unrecorded injury occurred. Because "[n]o citation may be issued . . . after the expiration of six months following the occurrence of any violation," 29 U.S.C. § 658(c), we agree with Volks that the citations are untimely and should be vacated.

I

The Occupational Safety and Health Act ("OSH Act" or "Act") provides that "[e]ach employer shall make, keep and preserve" records of workplace injuries and illnesses "as the Secretary . . . may prescribe by regulation." 29 U.S.C. § 657(c)(1). Pursuant to that delegated authority, the Secretary has promulgated a set of regulations which require employers to record information about work-related injuries and illnesses in three ways. Employers must prepare an incident report and a separate injury log "within seven (7) calendar days of receiving information that a recordable injury or illness has occurred," 29 C.F.R. § 1904.29(b)(3), and must also prepare a year-end summary report of all recordable injuries during the calendar year, *id.* § 1904.32(a)(2). This year-end summary must be certified by a "company executive." *Id.* §

1904.32(b)(3). The employer "must save" all of these documents for five years from the end of the calendar year those records cover. *Id.* § 1904.33(a).

On May 10, 2006, OSHA began an inspection of Volks and discovered that Volks had not been diligent in completing its logs, forms, and summaries between 2002 and early 2006. Accordingly, on November 8, 2006, OSHA issued the set of citations at issue in this case. OSHA fined Volks a total of $13,300 for 67 violations of 29 C.F.R. § 1904.29(b)(2)— incident report forms were incomplete, 102 violations of 29 C.F.R. § 1904.29(b)(3)—injuries were not entered in the log, one violation of 29 C.F.R. § 1904.32(a)(1)—year-end reviews were not conducted between 2002 and 2005, and one violation of 29 C.F.R. § 1904.32(b)(3)—the wrong person certified the year-end summary.[1] The improperly recorded injuries occurred between January 11, 2002 at the earliest and April 22, 2006 at the latest. These dates are equivalent to a maximum of 54 months before the issuance of the citation, and a minimum of six months plus ten days before the issuance of the citation. Volks was not cited for any violation of the requirement in 29 C.F.R. § 1904.33(a) that it "save" the forms and the log for five years.

Because the Act says that "[n]o citation may be issued . . . after the expiration of six months following the occurrence of any violation," 29 U.S.C. § 658(c), and because the injuries giving rise to recording failures took place more than six months before the issuance of the citation, Volks moved to dismiss these citations as untimely. After the OSHA ALJ

---

[1] OSHA issued a fifth citation for failing to post the year-end summary for a long enough time period in 2006, but this item was unanimously vacated by the Occupational Safety and Health Review Commission (OSHRC) and is not before this Court.

affirmed the citations, Volks appealed to the Occupational Safety and Health Review Commission (OSHRC). The Secretary said all the violations for which Volks was cited are "continuing violations" that prevent the statute of limitations from expiring until the end of the five-year document retention period in 29 C.F.R. § 1904.33(a). Therefore, the Secretary argued, all of Volks's violations, stretching as far back as January of 2002, were still occurring on May 10, 2006 when the inspection began. The citations were issued two days shy of six months later than that date, so the Secretary argued they were timely. By a 2-1 vote, and over the vigorous dissent of the minority Commissioner, the Commission agreed with the Secretary and affirmed the citations. AKM LLC, 23 BNA OSHC 1414 (No. 06-1990, 2011) ("*Commission Decision*"). This petition for review followed.

## II

The question in this case is whether the Act's record-keeping requirement, in conjunction with the five-year regulatory retention period, permits OSHA to subvert the Act's six-month statute of limitations.

Because the Secretary of Labor has interpreted the Act and her regulations to pretermit the Act's statute of limitations, we first determine whether we must defer to her interpretation. Generally, the answer is yes so long as the statutes and regulations in question are ambiguous and the Secretary's interpretations are reasonable. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984); *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000). This is so even if the Secretary's interpretation arises in an administrative adjudication rather than in a formal rulemaking process. *Martin v. OSHRC*, 499 U.S. 144, 157

(1991) ("[T]he Secretary's litigating position before the Commission is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a workplace health and safety standard."); *see Auer v. Robbins*, 519 U.S. 452, 462 (1997) (holding that the Secretary's interpretation of regulations receives deference even if contained in a brief).

Since the *method* by which the Secretary's interpretation has been articulated in this case places it within the ambit of our deference, the next question is whether the interpretation of a statute of limitations is the *type* of question which triggers our deference. We have recently suggested that, in at least some circumstances, agency interpretations of statutes of limitations do trigger *Chevron* deference. *Intermountain Ins. Serv. of Vail v. Comm'r*, 650 F.3d 691, 707 (D.C. Cir. 2011). Because we find this statute to be clear and the agency's interpretation unreasonable in any event, *infra*, we need not and do not decide now that this case presents the same circumstances as *Intermountain* or that deference to agency interpretations of statutes of limitations is warranted as a rule. Rather, we assume without deciding that *Chevron* deference is available because the interpretation offered by the agency here "cannot survive even with the aid of *Chevron* deference." *Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1210 (D.C. Cir. 1996).

## III

We thus begin with the text of the statute. If Congress has clearly expressed its will, our inquiry is at an end. *Chevron*, 467 U.S. at 843. We think the statute is clear; the citations are untimely.

The statute of limitations provides that "no citation may be issued . . . after the expiration of six months following the

occurrence of any violation." 29 U.S.C. § 658(c). Like the Supreme Court, we think the word "occurrence" clearly refers to a discrete antecedent event—something that "happened" or "came to pass" "in the past." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–10 & n.5 (2002) (citing dictionaries); *see* Black's Law Dictionary 1080 (6th ed. 1990) (defining "occurrence" as "a coming or happening[;] [a]ny incident or event"); Webster's Third New Int'l Dictionary 1561 (1981) (defining "occurrence" as "something that takes place" and noting that it is a term that "lacks much connotational range" for which synonyms are "incident, episode, [or] event").[2] In this case, every single violation for which Volks was cited—failures to make and review records—and every workplace injury which gave rise to those unmet recording obligations were "incidents" and "events" which "occurred" more than six months before the issuance of the citations. As the dissenting Commissioner stated in this case, "[b]y any common definition, there [was] no 'occurrence,' i.e., no discrete action, event, or incident, no coming about, and no process of happening, within the requisite six months." *Commission Decision*, at *18 (Thompson, Comm'r, dissenting). We agree.

The Secretary does not offer any other definition of "occurrence" but instead heroically attempts, as the dissenting Commissioner put it, to "tie this straightforward issue into a Gordian knot." *Id.* at *17. The Secretary argues such violations continue every day that an unmet record-keeping obligation remains unsatisfied. Because the statute *also* requires that "each employer shall make, keep and preserve"

---

[2] The Secretary attempts to distinguish *Morgan* on the grounds that it is a Title VII case, Resp't Br. at 25, but the Court's reasoning on this point in *Morgan* did not rely on any peculiarity of Title VII. 536 U.S. at 109–10.

those records as the Secretary prescribes, 29 U.S.C. § 657(c), and the Secretary has prescribed that work injuries be recorded "within seven (7) calendar days" of an incident report, 29 C.F.R. § 1904.29(b)(3), and those records be retained for five years, *id.* § 1904.33(a), the Secretary concludes the real statute of limitations for record-making violations is the length of the agency's record retention period plus the limitations period Congress proposed—here, five years beyond the six months stated in Section 658(c).

Despite the cloud of dust the Secretary kicks up in an effort to lead us to her interpretation, the text and structure of the Act reveal a quite different and quite clear congressional intent that requires none of the strained inferences she urges upon us. To the extent Congress delegated authority to the Secretary to require employers to "make, keep and preserve," records in Section 657(c), it did so only within the ambit set by the statutory scheme, including the limitations period in Section 658(c)—which expressly applies to "any regulations prescribed pursuant to this chapter," such as those promulgated pursuant to Section 657(c). 29 U.S.C. § 658(a). On the one hand, employers must make records of workplace injuries in whatever form the Secretary requires within the time period established by the Secretary—here, seven days after the injury. If they fail to do so, that is a violation. Pursuant to Section 658(c), OSHA may cite employers for violations within six months of the violation's occurrence. If an injury is reported on May 1, OSHA can cite an employer for the failure to create a record beginning on May 8, and a citation issued within the following six months, and only the following six months, would be valid. On the other hand, once an employer has made such a record, it must *also* retain it for as long as the Secretary demands and in the forms the Secretary requires—here, for five years. If it loses or destroys a record before the end of that time period, that too is a

violation. Pursuant to Section 658(c), OSHA may cite employers for violations within six months of a violation's occurrence, so for six months after the fifth year, and only for those six months, OSHA can cite an employer for the loss or destruction of a record. In this case, OSHA did not cite Volks for the loss or destruction of a record it never made, as much as the Secretary would now like to rely on that metaphysically impossible failure on Volks's part to extend the timeliness of other citations. OSHA only cited Volks for the failure to create a record, but it did so far too late.

The Secretary's interpretation of these two provisions, by contrast, has several flaws. First, it leaves little room for Section 658(c), and we must be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2330 (2011). At best, the Secretary's approach diminishes Section 658(c) to a mere six-month addition to whatever retention/limitations period she desires. We do not believe Congress expressly established a statute of limitations only to implicitly encourage the Secretary to ignore it. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). Second, the Secretary's interpretation incorrectly assumes that the obligation to maintain an existing record expands the scope of an otherwise discrete obligation to make that record in the first place. But the two obligations are distinct: one cannot keep what never existed; a company cannot retain a record it never created. *See Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2197 (2011) (noting that "retain" means "to hold or continue to

hold in possession or use," which in turn means "[y]ou cannot retain something unless you already have it").[3]

Third, the Secretary essentially asks us to conclude that the mere authorization to issue regulations governing the creation and preservation of records justifies an inference that Congress intended violations of record-*making* requirements to be treated as continuing violations. The Secretary's reasoning is not persuasive enough to overcome the "standard rule" that the limitations period is triggered by the existence of a complete cause of action, "[u]nless Congress has told us otherwise in the legislation at issue." *See Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.*, 522 U.S. 192, 201 (1997); *Cherosky v. Henderson*, 330 F.3d 1243, 1248 (9th Cir. 2003) ("The Supreme Court has made clear . . . that the application of the continuing violations doctrine should be the exception, rather than the rule."). Moreover, we are especially skeptical of the Secretary's inference when Volks's conduct is not even the sort of conduct we generally view as giving rise to a continuing violation. As we have held, continuing violations are those whose "character as a violation did not become clear until [they] w[ere] repeated during the limitations period, typically because it is only [the] cumulative impact . . . that reveals [their] illegality." *Taylor v. FDIC*, 132 F.3d 753, 765 (D.C. Cir. 1997). The illegality of Volks's conduct would be immediately apparent to an OSHA administrator. Without a clearer directive, we cannot presume Congress intended to depart from the general rule.

---

[3] That OSHA did not cite Volks for a failure to retain injury records when that is the only conduct for which the statute of limitations would not have clearly expired suggests that OSHA had, at some point, correctly understood that an unmade record cannot be said to have not been retained and that an employer's obligations with respect to making and keeping records are distinct.

The Secretary's interpretation also runs afoul of our precedents. Her approach would stitch the retention and creation obligations into one continuing obligation, but we have stated in no uncertain terms that the "lingering effect of an unlawful act is not itself an unlawful act," *Felter v. Kempthorne*, 473 F.3d 1255, 1260 (D.C. Cir. 2007), and that the "mere failure to right a wrong . . . cannot be a continuing wrong which tolls the statute of limitations," for if it were, "the exception would obliterate the rule," *Fitzgerald v. Seamans*, 553 F.2d 220, 230 (D.C. Cir. 1977). *See also Lorance v. AT&T Techs., Inc.*, 490 U.S. 900, 908 (1989) ("[A] claim . . . wholly dependent on . . . conduct occurring well outside the period of limitations . . . cannot [support] a continuing violation."); *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 422 (1960) (holding that "a finding of violation which is inescapably grounded on events predating the limitations period" is untimely); *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 730 (D.C. Cir. 2008) (concluding that an "ongoing failure to return . . . wrongfully seized property" cannot toll the statute of limitations); *Kyriakopoulos v. George Washington Univ.*, 866 F.2d 438, 448 (D.C. Cir. 1989) ("Any . . . action that merely declines to remedy [a] breach, so long as that action independently breaches no [other provision], gives rise to no [separate] action."). The mere requirement to save a record cannot possibly impose a continuing affirmative duty to correct past failures to make the record in the first place.

It is telling that in order to find supportive circuit law, the Secretary resorts to modifying a quotation which, properly quoted, is perfectly consistent with our conclusion.[4] The

---

[4] The Secretary also relies on three inapposite cases. The first, *United States v. Cores*, 356 U.S. 405, 408–09 (1958), addressed the concept of continuing offenses for the purposes of venue and not

Secretary says, "this Court has previously found that a statute of limitations will not operate to bar claims where the action (or inaction) that constitutes the basis for a claim was 'carried forward by more recent actions [or inactions].'" Resp't Br. at 39 (quoting *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. NLRB*, 363 F.2d 702, 706–07 (D.C. Cir. 1966). But that bracketed addition makes all the difference, and is simply not present in the decision. While we held that continued actions may extend the statute of limitations, nothing in that case suggests that *inaction* has the same effect, and this case is about inactions (hence the need for the Secretary's addition). In short, the Secretary's continuing violations theory would transform the failure to right a past wrong into a reason not to start the limitations clock—a result our precedents plainly proscribe.

Of course, where, for example, a company continues to subject its employees to unsafe machines, Resp't Br. at 26–27, or continues to send its employees into dangerous situations without appropriate training, Oral Arg. Recording at 30:50, OSHA may be able to toll the statute of limitations on a continuing violations theory since the dangers created by the violations persist. But the Secretary's argument here is instead grounded on the faulty logic that the mere existence of

statutes of limitations, a distinction described as "obvious[]," *United States v. Reitmeyer*, 356 F.3d 1313, 1323 (10th Cir. 2004) (citing *United States v. Toussie*, 397 U.S. 112, 121 n.16 (1970)). The second, *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1114–15 (4th Cir. 1988), discussed whether past conduct could give rise to citizen suits under the Clean Air Act, but said nothing about statutes of limitations. The last, *Wilderness Soc'y v. Norton*, 434 F.3d 584, 588 (D.C. Cir. 2006), held that an agency's failure to act constituted a continuing violation, but this was in the context of our mandamus jurisdiction. Mandamus is altogether different than ordinary rights of action, as we explained in that very case. *Id.*

a statutory provision authorizing her to require employers to make and keep records, 29 U.S.C. § 657(c), creates a continuing obligation that expands the statute of limitations. In rejecting that argument, we express no opinion on whether some other violations, if any, could, for some other reason, be extended by the continuing violations concept. *See Postow v. OBA Fed. Savings & Loan Ass'n*, 627 F.2d 1370, 1380 n.22 (D.C. Cir. 1980) (interpreting a statute of limitations to allow for a continuing violations theory in some circumstances, but not all, and suggesting the theory would in any event not allow a violation to continue "indefinitely after the transaction was consummated"). Instead, we simply conclude that the statutory language in Section 657(c) which deals with record-keeping is not authorization for OSHA to cite the employer for a record-making violation more than six months after the recording failure. *See Chalabi*, 543 F.3d at 730; *Fitzgerald*, 553 F.2d at 230.

Indeed, the Secretary's interpretation has absurd consequences in the context of the discrete record-making failure in this case. Under her interpretation, the statute of limitations Congress included in the Act could be expanded *ad infinitum* if, for example, the Secretary promulgated a regulation requiring that a record be kept of every violation for as long as the Secretary would like to be able to bring an action based on that violation. There is truly no end to such madness. If the record retention regulation in this case instead required, say, a thirty-year retention period, the Secretary's theory would allow her to cite Volks for the original failure to record an injury thirty years after it happened. Counsel for the Secretary readily conceded as much at oral argument. Oral Arg. Recording at 23:22–25:30. We cannot believe Congress intended or contemplated such a result. Congress's aim in creating OSHA was to improve the safety of America's workplaces. *See* 29 U.S.C. § 651(b).

13

Congress evidently thought this goal would be served by mandating that OSHA enforce record-making violations swiftly or else forfeit the chance to do so, as reflected in its requirement that citations not issue later than six months after a violation.[5] *Cf. Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980) ("By choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt [pursuit] of all charges . . . ."). Nothing in the statute suggests Congress sought to endow this bureaucracy with the power to hold a discrete record-making violation over employers for years, and then cite the employer long after the opportunity to actually improve the workplace has passed. "An interpretation of a statute purporting to set a definite limitation upon the time of bringing action, without saving clauses, which would, nevertheless, leave defendants subject indefinitely to actions for the wrong done, would, we think, defeat its obvious purpose." *Reading Co. v. Koons*, 271 U.S. 58, 65 (1926). It is not for us or the Secretary to unsettle Congress's chosen means of ensuring that outcome.

IV

The Act clearly renders the citations untimely, and the Secretary's argument to the contrary relies on an interpretation that is neither natural nor consistent with our precedents. The petition for review is granted and the citations are vacated.

*So ordered.*

---

[5] If the Secretary feels this limitations period is too short to allow for the discovery of unsafe conditions or health effects which may not become apparent for months or years into the future, she could argue the statute should be read to incorporate a discovery rule, as she had before the OSHA ALJ. But she did not press that argument before the Commission, *Commission Decision*, at *6, or here.

GARLAND, *Circuit Judge*, concurring in the judgment: Petitioner Volks Constructors raises three principal arguments relating to its OSHA citations. First, Volks contends that the Secretary's interpretation of the OSH Act's six-month statute of limitations, 29 U.S.C. § 658(c), is not entitled to *Chevron* deference. Second, it contends that, even if the Secretary were entitled to deference, her interpretation of the statute as authorizing citations for "continuing violations" is unreasonable. Third, Volks argues that the regulations that OSHA cited it for violating do not -- in any event -- impose continuing obligations that may be continually violated.

Volks' third argument suffices to resolve its petition because, as the Court states, the Secretary's regulations impose upon employers "discrete" rather than continuing obligations to make records. Court Op. at 8. I write to explain why those regulations cannot reasonably be read otherwise, and hence why the citations are untimely under the applicable statute of limitations. This does not mean, however, that the statute could not admit of a continuing violation theory under other circumstances.

I

The OSH Act's statute of limitations states: "No citation may be issued under this section after the expiration of six months following the occurrence of any violation." 29 U.S.C. § 658(c). As the Court notes, the word "occurrence" refers to something that "happened" in the past. Court Op. at 6 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-10 & n.5 (2002)). Here, the thing that "happened" was Volks' "violation" of an obligation imposed by the OSHA regulations specified in the citations. Under the statute, a violation can thus consist not only of an act, but also of a failure to act: here, Volks' "failures to make and review records" as required by the regulations. Court Op. at 6. Finally, I agree with my colleagues that, in this case, "every single violation for which Volks was

cited . . . 'occurred' more than six months before the issuance of the citations." *Id.* This is why:

1. OSHA cited Volks for violating 29 C.F.R. § 1904.29(b)(2) and (b)(3), by failing to record employees' work-related injuries and illnesses on the OSHA 300 log and OSHA 301 incident report forms. *See* Citation at 15-20, 21-29 (Nov. 8, 2006). That regulation requires an employer to "enter each recordable injury or illness on the OSHA 300 Log and 301 Incident Report within seven (7) calendar days of receiving information that a recordable injury or illness has occurred." 29 C.F.R. § 1904.29(b)(3). Volks contends that the seven days are a "grace period," at the end of which the violation "occur[s]" for purposes of the six-month statute of limitations. Pet'r Br. 33-34. Although the Secretary does not dispute that § 1904.29(b)(3) creates a grace period, she maintains that Volks' failures to record "constituted continuing violations beginning with Volks' initial failure to record . . . within seven days of learning of each injury or illness," and "then continu[ing] throughout the *five-year record retention period* prescribed by the regulations, which period had not elapsed as of the date of OSHA's inspection." Resp't Br. 16 (emphasis added).

The "five-year record retention period" referred to by the Secretary undermines rather than supports her argument. The regulation that prescribes that period, § 1904.33(a), requires an employer to "*save* the OSHA 300 Log . . . and the OSHA 301 Incident Report forms for five (5) years following the end of the calendar year that these records cover." 29 C.F.R. § 1904.33(a) (emphasis added). But the Secretary did not cite Volks for violating § 1904.33(a) by failing to *save* those documents; she cited it for violating §1904.29(b) by failing to *record* information on them. Indeed, she does not contend that Volks failed to "save" its logs and incident reports for five years or to have them available during that period.

Nor is there anything in the language of § 1904.33(a) that imposes a continuing obligation to update or correct those documents after seven days. To the contrary, the very next subsection of § 1904.33 makes clear that there is no continuous updating requirement applicable to Volks. With respect to the logs, § 1904.33(b) reads as follows:

> Do I have to update the OSHA 300 Log during the five-year storage period? Yes, during the storage period, you must update your stored OSHA 300 Logs to include *newly discovered* recordable injuries or illnesses and to show any changes that have occurred in the classification of previously recorded injuries and illnesses.

29 C.F.R. § 1904.33(b)(1) (emphasis added). In other words, the requirement to update a stored log does not obligate an employer to constantly reexamine injuries and illnesses, but rather is expressly limited to recording "newly discovered" information. Hence, because the Secretary does not contend that Volks discovered anything new after the seven-day period, the updating requirement for logs has no application to Volks.[1] The

---

[1] The Secretary's brief on this point is puzzling. It acknowledges that employers are not "required to constantly re-examine injures and illnesses during the five-year retention period." Resp't Br. 36. "Instead, the examination and assessment of illnesses and injuries should usually take place only once, either within the seven-day grace period found in § 1904.29(b)(3), or at any point thereafter as soon as the employer realizes that it has failed to meet its ongoing recording obligations." *Id*. And yet, there is nothing in the record to suggest that Volks "realized" *after* the passage of the seven-day period that it had failed to record a recordable case. To the contrary, the parties stipulated that "the date that Volks received information that a recordable injury or illness occurred" was the date of the "injury or illness" itself. Stipulations of the Parties ¶ 2.

analysis with respect to the incident report forms can be even briefer. Section 1904.33(b) expressly states: "You are *not required to update* the OSHA 301 Incident Reports." *Id.* § 1904.33(b)(3) (emphasis added).

In sum, even if a stand-alone provision with language like that in § 1904.29(b)(3) could be read to create an obligation that continues after a grace period,[2] § 1904.29(b)(3) does not stand alone. Instead, it is followed by another provision -- specifically addressed to "retention and updating" -- that makes clear that Volks did not have a continuing obligation to update its logs and incident reports. *See* 29 C.F.R. § 1904.33. Accordingly, Volks' violations occurred by the end of the relevant seven-day periods, and the Secretary had no more than six months thereafter to file her citations.[3]

---

[2]*Cf. United States v. George*, 625 F.3d 1124, 1131 (9th Cir. 2010) (holding that the registration provision of the Sex Offender Registration and Notification Act, which requires a sex offender to update the relevant sex offender registry "not later than 3 business days after each change of name, residence, employment, or student status," 42 U.S.C. § 16913(c), creates a "continuing offense" for purposes of the Ex Post Facto Clause), *vacated on other grounds*, 2012 WL 718297 (9th Cir. Mar. 7, 2012).

[3]For this reason, the Commission's comparison between an inaccurate entry on an OSHA 300 log and the existence of a condition that does not comply with a safety standard is inapt. *See* Commission Decision at *3-5. As discussed above, the recording regulations make clear that the company's recording obligation occurs at a particular time. By contrast, as discussed below in Part II, OSHA's safety standards impose abatement obligations that continue until the unsafe conditions are corrected. Those obligations are categorical and not bound to any particular time. *See, e.g.*, 29 C.F.R. § 1910.212(a)(1) (providing that "machine guarding shall be provided to protect the operator and other employees in the machine area from hazards").

2.   OSHA also cited Volks for violating 29 C.F.R. § 1904.32(a)(1) and (b)(3), by failing (i) to review the OSHA 300 log at the end of each relevant calendar year and correct any identified deficiencies, and (ii) to have a company executive certify that the annual summary was correct and complete.  *See* Citation at 29, 30.  The Secretary maintains that these violations, like those considered above, "constituted continuing violations for the entirety of the five-year retention period."  Resp't Br. 16-17.

Section 1904.32(a)  provides:

> *At the end of each calendar year*, you must: (1) Review the OSHA 300 Log to verify that the entries are complete and accurate, and correct any deficiencies identified; (2) Create an annual summary of injuries and illnesses recorded on the OSHA 300 Log; [and] (3) Certify the summary . . . .

29 C.F.R. § 1904.32(a) (emphasis added).  Another subsection provides that the certification must be made by a company executive.  *Id*. § 1904.32(b)(3).  This regulation does not contain a grace period, and it mentions no date regarding the obligations to review, create, and certify other than "the end of each calendar year."  Accordingly, on its face the regulation indicates that a violation occurs only once -- when there is a failure to fulfill a listed obligation at the end of a year.

Moreover, Volks' citation for failing to review the OSHA 300 log makes clear that the Secretary did *not* charge the company with a continuing violation.  That citation states: "*At the end of each calendar year*, the employer did not review the OSHA Log to verify that the entries were complete and accurate, and correct any deficiencies identified."  Citation at 29 (emphasis added).  In light of the introductory clause, it is

unreasonable to read this citation as charging a continuing violation; rather, in accordance with the regulation, it makes clear that the obligation occurred at the end of the relevant year. Although the citation for failing to have a company executive certify the annual summary does not contain the same introductory clause, it is based on the same regulatory provision, which imposes an obligation "[a]t the end of each calendar year." 29 C.F.R. § 1904.32(a).

Once again, the "five-year record retention period" offers no support for the Secretary's continuing violation theory. As it does with respect to the log and incident report forms, the record retention regulation requires a covered employer to "save" the annual summary for five years. *Id*. § 1904.33(a). The Secretary did not cite Volks for failing to save the summaries, and there is no suggestion that Volks failed in that regard. Nor did the Secretary cite Volks for failing to create annual summaries, as is also required "[a]t the end of each calendar year." *Id*. § 1904.32(a)(2). Indeed, the citation effectively concedes that Volks did so.[4] Instead, Volks was cited for two failures that necessarily had to have taken place before or at the time the annual summary was created. A self-evident purpose of requiring *review* of the OSHA 300 log at the end of the year, *id*. § 1904.32(a)(1), is to ensure the accuracy of the annual summary that is based on that log, *see id*. § 1904.32(a)(2). And the company executive's *certification* of the accuracy of the annual summary, required by § 1904.32(b)(3), must be made directly on the annual summary form itself. *See* OSHA Form 300A.

---

[4]The citation states that certification was made by Volks' Human Resources/Safety Manager rather than a company executive. Citation at 30. Certification is made on the annual summary itself. *See* OSHA Form 300A, *available at* http://www.osha.gov/recordkeeping/RKforms.html.

Accordingly, to make even a colorable claim that Volks' violations were continuing, the regulation would have to require Volks not just to *save* the annual report, but to *update* it during the five-year record retention period. But the question of whether there is such an updating requirement is asked and answered by the OSHA regulation itself: "Do I have to update the annual summary? No, you are not required to update the annual summary, but you may do so if you wish." 29 C.F.R. § 1904.33(b)(2).

3. In sum, it is clear that the obligations imposed by § 1904.29(b)(2) and (b)(3) must be satisfied by the end of that regulation's seven-day grace period, while the obligations imposed by § 1904.32(a)(1) and (b)(3) must be satisfied at the end of the relevant year. Those obligations do not continue thereafter. Hence, for purposes of 29 U.S.C. § 658(c), "violation[s]" of these regulations "occur[]" at those dates and do not continue. And, as § 658(c) requires, "no citation may be issued . . . after the expiration of six months following the occurrence of any [such] violation."[5]

---

[5]The Secretary's repeated references to two provisions of the OSH Act do not advance her claim that Volks can be cited for continuing violations in this case. Section 657(c)(1) provides that "[e]ach employer shall make, keep and preserve . . . such records regarding his activities . . . as the Secretary . . . may prescribe by regulation." 29 U.S.C. § 657(c)(1). Section 657(c)(2) provides that "the Secretary . . . shall prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses." *Id*. § 657(c)(2). But Volks was not cited for violating *statutes* that authorize the prescription of regulations. Rather, it was charged with violating specific *regulations* that the Secretary actually did prescribe. As discussed in the text, those regulations do not impose continuing obligations.

8

II

None of this is to say, as the petitioner suggests in its opening brief, that a statute of limitations like § 658(c) can never admit of a continuing violation for a failure to act. To the contrary, where a regulation (or statute) imposes a continuing obligation to act, a party can continue to violate it until that obligation is satisfied, and the statute of limitations will not begin to run until it does.

As the Court notes, OSHA's record retention regulation imposes such a continuing obligation: an employer "must save the OSHA 300 Log, . . . the annual summary, and the OSHA 301 Incident Report forms for five (5) years." 29 C.F.R. § 1904.33(a); *see* Court Op. at 7-8, 9 n.3. If the employer "loses or destroys a record before the end of that time period, that . . . is a violation." Court Op. at 7-8. Indeed, even if the company simply does not *have* the record during that period -- whether because it was lost or destroyed or for any other reason, known or unknown -- that too is a violation of the obligation to retain the records for five years. Accordingly, OSHA may cite an employer for such a violation "for six months after the fifth year." *Id*. at 8.

Similarly, if an employer fails in its regulatory obligation to provide "machine guarding . . . to protect the operator and other employees in the machine area from hazards," 29 C.F.R. § 1910.212(a)(1), a citation remains timely more than six months after the first unguarded day, because each day a machine is unguarded there is a continuing violation -- a continuing "occurrence." *See* Court Op. at 11. Likewise, as Volks itself acknowledges, OSHA regulations requiring employers to train their employees impose continuing obligations that an employer can continue to violate, at least as long as the employee is in the workplace and exposed to danger.

Oral Arg. Recording at 30:50; *see* Court Op. at 11. Hence, an employer can violate the asbestos training requirement, which requires that it provide training to employees who are exposed to specified concentrations of asbestos "prior to or at the time of initial assignment," 29 C.F.R. § 1910.1001(j)(7), long after the time of that initial assignment.

This court has read statutes of limitations similar to § 658(c) as allowing for continuing violations in other contexts as well. At issue in *Postow v. OBA Federal Savings & Loan Ass'n*, 627 F.2d 1370 (D.C. Cir. 1980), for example, was the Consumer Credit Protection Act's statute of limitations, which provides that an action must be brought "within one year from the date of the occurrence of the violation" of the Act, 15 U.S.C. § 1640(e). The statutory provision allegedly violated required lenders to make certain disclosures "before the credit is extended." 627 F.2d at 1374 (quoting 15 U.S.C. § 1639(b) (1976)). Although we concluded that credit was "extended" when the defendant bank became obligated to make a loan and the plaintiff borrowers paid a stand-by fee, we held that "the nondisclosure violation [w]as a continuing one" that first occurred when the bank became obligated but continued until the borrowers were given the required disclosures at settlement. *Id*. at 1380.[6]

---

[6]Similarly, in *Wilderness Society v. Norton* we indicated that the plaintiff's suit against the National Park Service (NPS) for failing to perform statutorily mandated wilderness reviews was not time-barred by the six-year statute of limitations for "'every civil action commenced against the United States,'" notwithstanding that the plaintiff brought its claim more than six years after NPS had failed to meet its statutory deadline to perform such reviews. 434 F.3d 584, 588-89 (D.C. Cir. 2006) (quoting 28 U.S.C. § 2401(a)). This was so, we said, because NPS was "in continuous violation of its statutory obligations." *Id*. at 588. Although we did regard the plaintiff's statutory claims as comparable to mandamus, *see* Court Op. at 11 n.4, what mattered was that the plaintiff did "not complain about what the

Also significant are a number of appellate decisions holding that the registration provision of the Sex Offender Registration and Notification Act creates a "continuing offense" for purposes of the Ex Post Facto Clause. *See, e.g.*, *United States v. Clements*, 655 F.3d 1028, 1029 (9th Cir. 2011). That provision requires a sex offender to update the relevant sex offender registry "not later than 3 business days after each change of name, residence, employment, or student status," 42 U.S.C. § 16913(c). *See also United States v. Edelkind*, 525 F.3d 388, 393 (5th Cir. 2008) (holding that the willful failure to pay child support is a continuing offense for purposes of the statute of limitations).

These regulatory and statutory violations cannot be distinguished from the ones before us on the ground that they involve repeated acts rather than continuing failures to act. They do not. Instead, they are distinguishable because in each case it is reasonable to read the provision at issue as imposing a continuing obligation. Here, by contrast, such a reading is simply implausible.

### III

An "agency is entitled to . . . deference when it adopts a reasonable interpretation of regulations it has put in force." *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 397 (2008). In this case, however, the Secretary's contention -- that the regulations that Volks was cited for violating support a "continuing violation" theory -- is not reasonable. Accordingly,

---

agency ha[d] done but rather about what the agency ha[d] yet to do." 434 F.3d at 589 (internal quotation marks omitted). And what the agency had "yet to do" was to meet a statutory deadline that had long since passed. *See id.*

because none of the challenged citations were issued within six months "following the occurrence of any violation," 29 U.S.C. § 658(c), I agree with my colleagues that the petition for review should be granted and the citations vacated.

BROWN, *Circuit Judge*, concurring: The law tends to snowball. A statement becomes a holding, a holding becomes a precedent, a precedent becomes a doctrine, and soon enough we're bowled over at the foot of a mountain, on our backs and covered in snow. So it is with our deference doctrines. Starting from a statement made in the *Chevron* decision—in which the Justices' own papers confirm the Supreme Court "did not mean to do anything dramatic," Cass R. Sunstein, Chevron *Step Zero*, 92 Va. L. Rev. 187, 188 (2006)—we have come to a place where an agency asks us with a straight face to defer to its interpretation of a statute of limitations: a simple, legislatively-imposed time limit on its own prosecutorial authority. As the Court's opinion today points out, we still have not decided whether such a statutory provision is deserving of *Chevron* deference. *See* Court Op. at 5; *Intermountain Ins. Serv. of Vail v. Comm'r*, 650 F.3d 691, 707 (D.C. Cir. 2011) (noting that "this circuit has yet to decide whether or under what circumstances to give *Chevron* deference to agency interpretations of statutes of limitations" and only conferring such deference "at least in the context of this case"—a "complex administrative system for assessing tax deficiencies and . . . expert interpretation of technical statutory language").[1] When we do finally decide that question, I urge us to pay closer attention to first principles.

Too often, we reflexively defer whenever an administrative agency claims statutory ambiguity, but this is not our charge. *See Ala. Educ. Ass'n v. Chao*, 455 F.3d 386, 392–93 (D.C. Cir. 2006). Resolving disputes over statutory meaning is ordinarily the province of the courts, and the

---

[1] We have deferred to an agency's interpretation of the tolling of a limitations period contained in its own regulations. *Alldata Corp. v. NLRB*, 245 F.3d 803, 807 (D.C. Cir. 2001). But no question of statutory interpretation was presented in that case, and consequently, the deference owed to an agency's interpretation of a statutory statute of limitations was not discussed.

exception to this rule—deference—is not something to which an agency is entitled simply by virtue of its being an agency that has expressed an interpretation in the proper form. What makes an agency's interpretation of a provision special is that Congress has manifested its intent that the agency's interpretation of that provision *be* special. It is by Congress's "delegation of authority to the agency to elucidate a specific provision of the statute" that an agency's interpretation is deserving of the court's deference. *Chevron*, 467 U.S. at 843–44; *see also United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). As the Supreme Court explained in *Chevron*, courts defer

> whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and [when] a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. . . . If [the agency's] choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.

*Chevron*, 467 U.S. at 844–45; *see also id.* at 866 ("When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy . . . the challenge must fail. In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do.").

When determining whether or not Congress has intended an agency to make an interpretive choice, we might look to whether that interpretive choice would involve making such a monumental policy choice that, although the agency may be expert, separation-of-powers considerations mean "there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (withholding deference); *see also Gonzales v. Oregon*, 546 U.S. 243, 262, 267–68 (withholding deference for fear of "unrestrained" agency power in an area which is "the subject of an earnest and profound debate" and which requires policy judgments best reserved to legislatures). On the other hand, if the interpretive question neither requires an agency's expertise nor "involve[s] reconciling conflicting policies," we may conclude that Congress has delegated nothing to the agency. *Chevron*, 467 U.S. at 844; *see* Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38 ADMIN. L. REV. 363, 368–69 (1986) (discussing agency expertise as a justification for deference).

Finally, we can also infer delegation or its absence by asking if "the particular question [is] one that the agency or the court is more likely to answer correctly," or whether the question "concern[s] common law or constitutional law, or . . . matters of agency administration," or whether "the agency can be trusted to give a properly balanced answer" rather than use the interpretive opportunity to "expand [its] power beyond the authority that Congress gave [it]." Breyer, *supra*, at 370–71; *see also* Thomas W. Merrill & Kristin E. Hickman, Chevron*'s Domain*, 89 GEO. L.J. 833, 912–13 (2001) (similarly suggesting that courts ask first "whether Congress would want the particular question about the scope of agency authority to be resolved" by deference and that "if the court

concludes that Congress would not want the agency to be the primary interpreter," it should not defer).

For example, I see no reason a court should have to defer to an agency's interpretation of ambiguities in a provision setting out the court's own jurisdiction to review that agency's action. As the Ninth Circuit explained, "[w]hile we ordinarily give great weight to the interpretation of the agency charged with enforcement of the statute we are construing, that deference does not extend to the question of judicial review, a matter within the peculiar expertise of the courts." *Love v. Thomas*, 858 F.2d 1347, 1352 n.9 (9th Cir. 1988). This much seems clear.

But deferring to an agency's interpretation of its *own* jurisdiction without some clear indication from Congress that it has delegated jurisdiction-defining authority to the agency can raise the same separation-of-powers, expertise, and agency trust concerns. We have come to infer delegation by mere statutory ambiguity, *see Chevron*, 467 U.S. at 743, but when it comes to jurisdiction, more should be required. After all, "one of this court's principal functions [is] to ensure that [an agency] exercises power only within the channels intended by Congress, especially [when making such a determination] involves no special administrative expertise that a court does not possess." *FedEx Home Delivery v. NLRB*, 563 F.3d 492, 496 (D.C. Cir. 2009); *see also Am. Civil Liberties Union v. FCC*, 823 F.2d 1554, 1567 n.32 (D.C. Cir. 1987) ("[I]t seems highly unlikely that a responsible Congress would implicitly delegate to an agency the power to define the scope of its own power."). It is for this reason that, when "general principles of the law" are to be applied to undisputed jurisdictional facts, "we need not accord the [agency's] decision that special credence which we normally show merely because it represents the agency's considered

judgment." *N. Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596, 598 (D.C. Cir. 1989).[2]

That we may have "generally" deferred to an agency's interpretation of its own jurisdiction in the past, *see, e.g.*, *UPS, Inc. v. NLRB*, 92 F.3d 1221, 1226 (D.C. Cir. 1996) ("[W]e have previously concluded that we should generally defer to an agency's interpretation of the statute that defines its jurisdiction."), does not make it right as a rule. That the Supreme Court may have likewise indicated a willingness to defer, *see, e.g.*, *CFTC v. Schor*, 478 U.S. 833, 844–45 (1986); *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 380–82 (1988) (Scalia, J., concurring), only shows how far we have strayed from our role. *See id.* at 386–87 (Brennan, J., dissenting) (rejecting deference because "agencies do not 'administer' statutes confining the scope of their jurisdiction, and such statutes are not 'entrusted' to agencies[,] [n]or do the normal reasons for agency deference apply"). And, in fact, even in *Schor*, the Court did not simply infer a delegation to the agency. Instead, the Court was careful to note that there was more—"abundant evidence that Congress both contemplated and authorized the CFTC's assertion of jurisdiction" and that "Congress intended to vest in the CFTC the power to define the scope" of its jurisdiction. 478 U.S. at 847, 842; *see also Rapanos v. United States*, 547 U.S. 715, 739 (2006) (citing *Chevron* but finding the jurisdictional provision clearly contrary to the agency's interpretation).

---

[2] In *N. Am. Van Lines*, we did still afford "some deference" to the agency's "conclusions drawn from the factual setting" of the particular case, 869 F.2d at 599, but the Secretary did not rely on any such particular conclusions in this case. Far from it, the Secretary made a bright-line textual argument which, if accepted, would govern the timeliness of citations in every future case.

Agency interpretations of statutes of limitations like the one at issue in this case are similarly poor candidates for deference.  In general, statutes of limitations are not the sort of technical provisions requiring or even benefiting from an agency's special expertise.  Rather, much like many jurisdictional provisions, these are texts with which courts are intimately familiar, as we interpret and apply them every day.  Nor do statutes of limitations generally suggest any policies that have been left by Congress for an agency to reconcile.  *Cf. Mississippi Power & Light Co.*, 487 U.S. at 386–87 (Brennan, J., dissenting) (making the same points regarding jurisdictional statutes).  Surely some may, *see Intermountain*, 650 F.3d at 694, 707, but many do not.

Finally, and perhaps most compellingly, statutes of limitations are designed to constrain the government's enforcement authority and to promote finality, repose, and the efficient and prompt administration of justice.  *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008) ("Some statutes of limitations . . . seek not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal, such as facilitating the administration of claims, limiting the scope of a governmental waiver of sovereign immunity, or promoting judicial efficiency."); *Carter v. Wash. Metro Area Transit Auth.*, 764 F.2d 854, 857 (D.C. Cir. 1985) ("[F]inality of outcome, regardless of the merits of the claim, is exactly the purpose of the statute of limitations that the legislature has enacted.").  On the one hand, the "obvious purpose" of statutes of limitations is to tell citizens and businesses when they no longer have to fear finding the government at their front door demanding satisfaction, *Reading Co. v. Koons*, 271 U.S. 58, 65 (1926), and on the other, statutes of limitations encourage government to act swiftly to enforce order and punish offenses.  They are thus different than the ordinary authority-

setting statutes which populate the administrative state and which routinely receive deference. All limits are not created equal. To say that the limits of a broad delegation of authority are discerned only at the outer bounds of judicial review surely does not mean that narrow and specific limitations on agency authority are similarly difficult to define. Statutes of limitations—being constraints on agency power—are qualitatively different than grants of plenary power. A statute of limitations uniquely limits when an agency may act—*even within* otherwise lawful bounds.

Because an agency's interpretation of such a statute could permit it to escape these particularly important constraints, statutes of limitations exemplify the sort of question to which an agency cannot "be trusted to give a properly balanced answer" and about which we should be especially vigilant. Breyer, *supra*, at 371; *see Mississippi Power & Light Co.*, 487 U.S. at 387 (Brennan, J., dissenting) (expressing reluctance to apply *Chevron* to jurisdictional statutes because such statutes "manifest[] an unwillingness to give the agency the freedom to define the scope of its own power"); Ernest Gellhorn & Paul Verkuil, *Controlling* Chevron-*Based Delegations*, 20 CARDOZO L. REV. 989, 1008–09 (1999) (noting that "[n]othing is more important to an agency than the scope of its regulatory authority" and that "agency self-interest may cloud its judgment"); *see generally* Timothy K. Armstrong, Chevron *Deference and Agency Self-Interest*, 13 CORNELL J.L. & PUB. POL'Y 203 (2004) (explaining why interpretations advancing agencies' financial and jurisdictional self-interest have been and should be viewed skeptically by courts).

We once took some of these concerns to heart. In *3M Co. v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994), we did not hesitate to disregard an agency's interpretation of a general statute of limitations on federal civil penalties. To be sure,

courts have repeatedly held that "[w]hen a statute is administered by more than one agency, a particular agency's interpretation is not entitled to *Chevron* deference," *Proffitt v. FDIC*, 200 F.3d 855, 860 (D.C. Cir. 2000), but in *3M*, we did not rely exclusively on this rationale. Instead, we said we "[could not] agree with [the agency] that our interpretation of [the statute of limitations] ought to be influenced by [the agency's] particular difficulties in enforcing" its own statutory responsibilities, and we rejected arguments turning on the agency's scarce resources and needs for prioritization as "more appropriate for a congressional oversight hearing" than for meriting deference in this Court. *Id.* at 1461. We were rightly troubled by the notion of being asked by an agency to expand that agency's enforcement authority when Congress had evidently not seen fit to do so.

Similarly, some of our sister Circuits have also declined to defer to agencies' interpretations of statutes of limitations, even those contained in the statutes the agency administers, because statutes of limitations are "not a matter within the particular expertise of the [agency]" and are "clearly legal issue[s] that courts are better equipped to handle." *Bamidele v. INS*, 99 F.3d 557, 561 (3d Cir. 1996) (quoting *Dion v. Sec'y of Health & Human Servs.*, 823 F.2d 669, 673 (1st Cir. 1987)); *Lynch v. Lyng*, 872 F.2d 718, 724 (6th Cir. 1989) ("[T]he amount of weight accorded an agency interpretation diminishes further when the interpretation does not require special knowledge within the agency's field of technical expertise."). Other circuits have nonetheless afforded deference on this subject when the statute of limitations is not general, like in *3M*, but specific to the agency. *See Asika v. Ashcroft*, 362 F.3d 264, 271 n.8 (4th Cir. 2004) (rejecting *Bamidele*); *Interamericas Investments v. Bd. of Governors*, 111 F.3d 376, 382 (5th Cir. 1997); *Capital Tel. Co. v. FCC*, 777 F.2d 868, 871 (2d Cir. 1985) (per curiam).

Confronted with a statute of limitations that does not involve the sort of intricacies that motivated us to reject *Bamidele* in "the context of" *Intermountain*, 650 F.3d at 707, I would find any ambiguities to be ours to resolve and not the agency's. Our narrower disposition of this case, instead assuming without deciding that *Chevron* applies, should not be read as foreclosing a future panel of this Court from tackling anew the deference owed to agency interpretations of statutes of limitations, even those reached and conveyed in the proper form. When that time comes, I hope this Court will carefully consider why and when we are meant to defer before we endow an agency's mere invocation of *Chevron* with talismanic authority. We must steadfastly guard our prerogative to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and resist the reflex of deference.